PER CURIAM.
 

 This case is before the Court on appeal from an order denying a motion to vacate a judgment of conviction of first-degree murder and a sentence of death under Florida Rule of Criminal Procedure 3.851. Because the order concerns postconviction relief from a capital conviction for which a sentence of death was imposed, this Court has jurisdiction of the appeal under article V, section 3(b)(1) of the Florida Constitution.
 

 For the reasons explained below, we affirm the trial court’s denial of Parker’s guilt phase and evidentiary hearing claims, but reverse and remand for a new penalty phase proceeding because counsel failed to fully investigate and present mitigating evidence regarding Parker’s childhood and mental health.
 

 FACTS AND PROCEDURAL HISTORY
 

 Dwayne Irwin Parker was convicted of first-degree murder, armed robbery, and aggravated battery with a firearm related to the robbery of a Pizza Hut in Pompano Beach in 1989. The facts of the case are fully explained in
 
 Parker v. State,
 
 641 So.2d 369, 372-73 (Fla.1994). The jury recommended a death sentence by a vote of eight to four. The trial judge agreed with the jury’s recommendation and sentenced Parker to death. The trial judge found four aggravating factors: (1) Parker had a prior conviction of a violent felony; (2) Parker knowingly created a great risk of death to many persons; (3) the murder was committed while Parker was engaged in committing, or during flight after committing, a robbery; and (4) the murder was committed to avoid or prevent arrest. The judge found that no statutory or non-statutory mitigating circumstances had been established.
 

 On direct appeal, Parker raised sixteen claims.
 
 [1]
 
 This Court found the claims either to be without merit, not properly preserved for appellate review, or harmless beyond a reasonable doubt.
 
 Id.
 
 at 372-78. Accordingly, we affirmed the convictions and the sentence of death.
 

 Parker filed his initial motion for post-conviction relief in 1997 and requested leave to amend the motion after the State complied with all of his outstanding public records requests. Pursuant to the subsequently enacted Florida Rule of Criminal Procedure 3.852(h)(2), Parker filed multi-
 
 *977
 
 pie requests for additional public records that had not been included in his initial requests. Parker filed an amended post-conviction motion in June 2000 and a
 
 Huff
 
 hearing
 
 [2]
 
 was scheduled for April 2001. Parker continued to file requests for additional public records. In February 2002, the trial court issued an order summarily denying all of Parker’s postconviction claims.
 

 Parker appealed the denial to this Court and also filed a habeas petition. He raised fourteen issues in the postconviction appeal.
 
 Parker v. State,
 
 904 So.2d 370, 374 n. 2 (Fla.2005).
 
 [3]
 
 He raised a number of claims in his habeas petition,
 
 [4]
 
 but we found no merit to these claims and denied habeas relief.
 

 We concluded that Parker’s claim of ineffective assistance of counsel during the guilt and penalty phases required an evi-dentiary hearing. Thus, we reversed the trial court’s order as to this single issue and remanded for an evidentiary hearing on counsel’s failure to present expert testimony on the fatal bullet and failure to fully investigate and present mitigating evidence concerning Parker’s abusive childhood and alleged mental illness.
 
 Id.
 
 at 375-378. We also concluded that Parker was entitled to an evidentiary hearing to present evidence of the abuse he suffered as a child and his mental infirmities, which he claimed was never presented during trial.
 
 Id.
 
 at 378.
 

 
 *978
 
 On remand, the postconviction trial court conducted a five-day evidentiary hearing. Parker presented testimony from thirteen witnesses, including his lead trial counsel Bo Hitchcock, penalty phase counsel Theodore Booras, public defender investigators Howard Finkelstein and Carton Moore, guilt phase investigator Cary Kultau, mental health expert Dr. Glenn Caddy, Parker’s sister Princess Ferrette, family friend Virginia Holcombe, childhood friend Gregory Pender, child protective services worker Dr. Larry Richardson, psychiatric expert Dr. David Pickar, psychologist Dr. Jethro Toomer, neuropsychologist Dr. Barry Crown, and photography expert Robert Wyman. Parker attempted to call four other witnesses in support of his claim of ineffective assistance of counsel during the guilt phase. However, the lower court granted the State’s motion to strike these witnesses and Parker was precluded from calling Detective Robert Cerat, Dr. Michael Bell, Dr. Ronald Wright, and State Attorney Michael Satz. Following the evidentiary hearing, the trial court denied all postcon-viction relief.
 

 Parker has appealed the denial of post-conviction relief on his claims of ineffective assistance of counsel at the guilt and penalty phases of trial. He also claims that he was denied a full and fair evidentiary hearing below because the judge should have recused himself based on an alleged bias exhibited toward Parker and because Parker was not allowed to present evidence relevant to his claim of guilt phase ineffective assistance of counsel based on the court’s exclusion of four witnesses. We find no merit to the claims of ineffective assistance of counsel at the guilt phase regarding the bullet evidence and the denial of a fair evidentiary hearing. We find that Parker’s third claim, ineffective assistance of counsel at the penalty phase regarding mitigating evidence, requires a new penalty phase trial. This opinion will discuss each of these claims in turn.
 

 GUILT PHASE INEFFECTIVE ASSISTANCE OF COUNSEL
 

 Parker claims that his trial counsel rendered ineffective assistance at the guilt phase of trial because he failed to retain forensic experts in the fields of photography and tool marking to challenge the State’s bullet evidence. This claim is based on the following circumstances. In his autopsy report, written findings, and first sworn deposition, medical examiner Dr. Michael Bell stated that the bullet removed from the victim’s body was silver-colored and had no deformations or cuts on it. One month before trial, the prosecutor called Dr. Bell and asked him to look at his photographic slide of the bullet embedded in the victim’s body. Dr. Bell then noticed that there was a cut in the bullet and, although the center of the bullet appeared white because of the reflection of the flash, that the bullet was actually gold-colored at the margins where the flash was not reflected. In a second sworn deposition, Dr. Bell stated that he had made a mistake and the bullet was actually gold-colored and had a deformation or cut visible on it. The color of the bullet was significant because Parker’s bullets were all gold-colored and the sheriffs deputies used silver-colored bullets.
 
 Parker,
 
 904 So.2d at 376 n. 4;
 
 Parker,
 
 641 So.2d at 374 n. 5. Parker’s defense theory had been that the victim was mistakenly shot by the responding deputies who thought the victim was involved in the crime when they saw him running after Parker.
 

 At trial, the State presented the bullet that was removed from the victim’s body. Dr. Bell testified that he had removed this bullet from the victim and gave it to Detective Cerat who placed it into an evidence
 
 *979
 
 envelope. Detective Cerat testified that he was present at the autopsy, saw Dr. Bell remove the bullet, personally placed the bullet in the evidence envelope, sealed the envelope, and took possession of the bullet. Both the medical examiner and the detective testified that they initialed the evidence envelope. Detective Cerat also testified that he took the photographs of the bullet that were introduced into evidence. He further testified that, because of the photographic flash, the bullet in the original prints appeared white in the middle and gold at the edges. Firearms examiner Patrick Garland testified that he made enlargement photographs of the bullet and of the photograph depicting the bullet embedded in the victim by using a camera attached to a microscope. Garland testified that he was able to determine that the same bullet was depicted in both photos based on distinctive marks and scratches visible on the bullet in the enlargement photos. While defense counsel cross-examined all of the witnesses about the quality and accuracy of the bullet photos and was able to raise questions as to their evidentiary value, he did not present a photographic expert to challenge the photographs or a tool mark expert to challenge the comparison made by Garland.
 

 On direct appeal, Parker raised two claims related to the bullet evidence. First, he claimed that the trial court erred by letting the State introduce into evidence new photographs of the bullet that were different in color from the original prints.
 
 Parker,
 
 641 So.2d at 374. This Court concluded that the trial court conducted an adequate hearing under
 
 Richardson v. State,
 
 246 So.2d 771 (Fla.1971), as to these photographs and properly found that this was an inadvertent discovery violation and that Parker had suffered no prejudice because he knew about the color variation in the photographs. This Court also concluded that Parker had not demonstrated reversible error regarding this issue.
 
 Parker,
 
 641 So.2d at 374. The second claim was not directed at the bullet evidence, but involved it tangentially. Parker claimed that the trial court had ignored his complaints about counsel’s competency.
 
 Id.
 
 In explaining the context of this claim, this Court quoted from an exchange between Parker and the trial court involving the bullet evidence. This exchange took place just prior to jury selection.
 
 Id.
 
 at 374 n. 6. Parker complained that counsel had not asked the court for a special investigation regarding the bullet evidence based on the changed testimony of the medical examiner about the color of the bullet. Parker complained that the police force and state attorney should not be investigating the bullet evidence when the evidence might prove that the police actually killed the victim. The judge told Parker to put his complaints in writing and send them to whomever he thought could help him. Based on Parker’s comments, counsel asked the court for a continuance to allow an independent investigation of the bullet evidence and of how the case had been handled by the police and the state attorney. The court denied the requested continuance.
 
 Id.
 
 This Court found no merit to Parker’s overarching claim because, Parker “was complaining about the criminal justice system, not about his counsel’s abilities as an advocate” and because he never requested substitute counsel.
 
 Id.
 
 at 375.
 

 In his postconviction motion, Parker alleged that trial counsel should have presented expert testimony in photography and tool-marking to demonstrate that the color of the photographs depicting the bullet lodged in the victim’s lower spine was subject to manipulation and did not necessarily reflect the true color of the bullet shown in the photographs. Parker also asserted that it could not be established with any certainty that the bullet
 
 *980
 
 that killed the victim was the same bullet that was fired from Parker’s gun.
 

 Parker’s claim of ineffective assistance of counsel at the guilt phase of trial is subject to the standard set forth in
 
 Strickland v. Washington,
 
 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Following
 
 Strickland,
 
 this Court has held that for ineffective assistance of counsel claims to be successful, two requirements must be satisfied:
 

 First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined. A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied.
 

 Maxwell v. Wainwright,
 
 490 So.2d 927, 932 (Fla.1986) (citations omitted). Because both prongs of the
 
 Strickland
 
 test present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the circuit court’s factual findings that are supported by competent, substantial evidence, but reviewing the circuit court’s legal conclusions de novo.
 
 See Sochor v. State,
 
 883 So.2d 766, 771-72 (Fla.2004). Where the denial of a postconviction claim follows an evidentiary hearing by the trial court, we afford deference to the trial court’s factual findings.
 
 McLin v. State,
 
 827 So.2d 948, 954 n. 4 (Fla.2002). “As long as the trial court’s findings are supported by competent substantial evidence, ‘this Court will not substitute its judgment for that of the trial court on questions of fact, likewise of the credibility of the witnesses as well as the weight to be given to the evidence by the trial court.’ ”
 
 Blanco v. State,
 
 702 So.2d 1250, 1252 (Fla.1997) (quoting
 
 Demps v. State,
 
 462 So.2d 1074, 1075 (Fla.1984)).
 

 In denying relief on this claim, the trial court stated that the sole credible issue as to Parker’s guilt was “the origin of the bullet that killed the victim,” noting that the issue at trial had not been what color the bullet was in a photograph, but what bullet actually killed the victim. The court also noted that the jury heard extensive evidence on this issue and ultimately determined that Parker had shot the victim. The jury rejected the defense’s theories of evidence tampering, conspiracy, collusion, and cover-up regarding the bullet evidence. The court concluded that Parker had not presented a single witness to offer an opinion that the bullet that the jury determined killed the victim was not the bullet that came out of the victim’s body and was placed in evidence. The court stated that nothing was presented at the evidentiary hearing to show that a photography expert could refute the trial testimony of Dr. Bell and Detective Cerat that the bullet in evidence was the fatal bullet taken from the victim at the autopsy. Thus, the court concluded that Parker had not proved deficient performance or prejudice as required by
 
 Strickland.
 
 We agree.
 

 As the postconviction order notes, Parker did not present any evidence to undermine the resolution of this issue at trial. He did not present a witness who could refute the chain of custody testimony relating to the bullet. Dr. Bell and Detective Cerat both testified that the bullet in evidence is the same bullet that was removed from the victim’s body, despite the color that is depicted in any of the photographs. Further, the jury heard Dr. Bell admit that he got the color of the bullet wrong and heard extensive questioning on
 
 *981
 
 this issue. Thus, Parker has not proven how he was prejudiced by counsel’s failure to present expert photography testimony. Additionally, while counsel made no effort to rebut the tool-marking testimony by Garland, Garland testified as a firearms expert that the lands and grooves on the bullet in evidence proved that it was shot from Parker’s weapon. Parker cannot show prejudice on this point either without refuting the chain of custody of the bullet. Accordingly, we affirm the trial court’s denial of relief on this claim.
 

 FAIRNESS OF POSTCONVICTION EVIDENTIARY HEARING
 

 Parker claims that he was denied a full and fair postconviction evidentiary hearing because the judge should have recused himself based on an alleged bias exhibited toward Parker and because Parker was not able to present evidence relevant to his claim of ineffective assistance at the guilt phase based on the court’s exclusion of four witnesses. We address each aspect of this claim in turn below.
 

 Judicial Bias
 

 Parker’s claim of judicial bias is premised on the security arrangements and physical limitations that the judge required during the evidentiary hearing. It is also premised on alleged racial bias exhibited by the judge. At the beginning of the evidentiary hearing, Parker’s counsel objected to the security measures, which included. Parker being seated in the jury box away from counsel table and being restrained with shackles and chains. The judge stated that these measures were necessary to insure the security of the courtroom, which he described as an “extremely insecure courtroom setting.” The judge also stated that he was deferring to the deputy who was responsible for Parker’s transportation that these measures were necessary. In order to facilitate communication between Parker and his counsel during the hearing, Parker was given a pen and paper to write down his comments or questions. Counsel also moved the defense table next to the jury box.
 

 Later in the proceedings, the judge noted that there were people present in the courtroom whom he believed to be connected to Parker based on eye contact and body language between Parker and those individuals. The judge stated that “security issues jump to mind.” Counsel explained that the African-American man seated behind counsel table was the investigator for Capital Collateral Regional Counsel and had no personal connection to Parker other than his professional investigation of the case.
 

 Parker subsequently filed a motion to disqualify the judge, citing the security-related issues and the judge’s concern over his dangerousness. Parker also cited the judge’s conclusion that an African-American male seated near defense counsel made “security issues jump to mind.” The judge denied the motion as legally insufficient. Parker claims that his due process rights were violated by the judge’s denial of his motion to disqualify.
 

 A motion to disqualify is governed substantively by section 38.10, Florida Statutes (2005), and procedurally by Florida Rule of Judicial Administration 2.330.
 
 See Cave v. State,
 
 660 So.2d 705, 707 (Fla.1995).
 
 [5]
 
 The rale provides that a motion to disqualify shall show that “the
 
 *982
 
 party fears that he or she will not receive a fair trial or hearing because of specifically described prejudice or bias of the judge” or that the judge is either an interested party to the matter, related to an interested party, related to the counsel, or “is a material witness for or against one of the parties to the cause.” Fla. R. Jud. Admin. 2.330(d). The standard of review of a trial judge’s determination on a motion to disqualify is de novo.
 
 Chamberlain v. State,
 
 881 So.2d 1087, 1097 (Fla.2004). Whether the motion is legally sufficient is a question of law.
 
 Barnhill v. State,
 
 834 So.2d 836, 843 (Fla.2002).
 

 In ruling on a motion to disqualify, a court is limited to determining the legal sufficiency of the motion itself and may not pass on the truth of the facts alleged. Fla. R. Jud. Admin. 2.330(f);
 
 see also MacKenzie v. Super Kids Bargain Store, Inc.,
 
 565 So.2d 1332, 1339 (Fla.1990). The term “legal sufficiency” encompasses more than mere technical compliance with the rule and the statute. The standard for viewing the legal sufficiency of a motion to disqualify is whether the facts alleged, which must be assumed to be true, would cause the movant to have a well-founded fear that he or she will not receive a fair trial at the hands of that judge.
 
 See
 
 Fla. R. Jud. Admin. 2.330(d)(1). Further, this fear of judicial bias must be objectively reasonable.
 
 See State v. Shaw,
 
 643 So.2d 1163, 1164 (Fla. 4th DCA 1994). The subjective fear of a party seeking the disqualification of a judge is not sufficient.
 
 See Kowalski v. Boyles,
 
 557 So.2d 885 (Fla. 5th DCA 1990). Rather, the facts and reasons given for the disqualification of a judge must tend to show “the judge’s undue bias, prejudice, or sympathy.”
 
 Jackson v. State,
 
 599 So.2d 103, 107 (Fla.1992);
 
 see also Rivera v. State,
 
 717 So.2d 477, 480-81 (Fla.1998). Where the claim of judicial bias is based on very general and speculative assertions about the trial judge’s attitudes, no relief is warranted.
 
 McCrae v. State,
 
 510 So.2d 874, 880 (Fla.1987).
 

 This is not a situation where the defendant was prejudiced by the jury viewing him in restraints, because this was a post-conviction proceeding without a jury. The issue is whether the judge’s heightened security measures and expressed concerns for the safety of those in the courtroom were an objective indicator of the judge’s undue bias or prejudice toward Parker. The judge, who was the sentencing judge in Parker’s trial, presided over Parker’s postconviction proceeding in a courtroom in the civil division where the judge was currently assigned. The judge stated that the courtroom was extremely insecure and that he was deferring to the deputy who believed these measures were necessary. The defense did not challenge these statements, but instead indicated that the seating arrangement would hamper counsel’s ability to communicate with Parker during the hearing. Based on this assertion, counsel was allowed to move counsel table close to the jury box where Pai'ker was seated; Parker was given a pen and paper to communicate further with counsel; and counsel was allowed to stand next to the jury box during the proceedings when necessary. In addition, defense counsel and Parker were allowed private consultations during breaks in the proceedings. As to the judge’s comments about “people in [the court room] that I don’t know that I know are connected to [Parker] that [cause] security issues [to] jump to my mind,” this was in the context of discussing the defense’s renewed objection to the security measures imposed. The judge used the defense investigator as an example of the possible security risks in the insecure courtroom.
 

 We do not find the judge’s heightened concern for safety to be a legally sufficient basis for his recusal from Parker’s case.
 
 *983
 
 Thus, Parker is not entitled to relief on this claim.
 

 Exclusion of Witnesses
 

 Parker also claims that he was denied a fair evidentiary hearing because he was precluded from presenting testimony from four witnesses. The witnesses included medical examiner Dr. Bell, Detective Cerat who took the photographs of the bullet and was present at the autopsy conducted by the medical examiner, the trial prosecutor Michael Satz, and Dr. Ronald Wright. At the case management conference prior to the evidentiary hearing, the State moved to strike these witnesses, arguing that them testimony had no bearing on counsel’s ineffectiveness in not obtaining experts in the fields of photography and tool marking. The State also argued that the issue of whether the bullet had been switched or the photographs manipulated had been fully litigated at trial. Parker’s counsel argued that the testimony of Dr. Bell and Detective Cerat were relevant to proving prejudice from trial counsel’s failure to present a photography expert to dispute the accuracy of the bullet photographs admitted at trial.
 
 [6]
 
 The trial court granted the State’s motion to strike the witnesses.
 

 We find that the trial court did not abuse its discretion in excluding these witnesses as them testimony was not relevant to the issue on remand, i.e., whether counsel rendered ineffective assistance for not obtaining and presenting testimony from experts in the fields of tool marking and photography.
 
 See Parker,
 
 904 So.2d at 376. While the two excluded witnesses took the photographs in question, Parker never explained how their testimony would have a bearing on counsel’s failure in this regard. Parker simply stated that the testimony of these witnesses was relevant to the prejudice prong, without further explanation. Moreover, in light of our resolution of Parker’s claim of ineffective assistance regarding the bullet evidence, the testimony of these witnesses would only have changed the outcome of that claim had the witnesses recanted their trial testimony or admitted that they tampered with the bullet evidence. Parker ascribed no such relevancy to their testimony. Thus, we find no merit to Parker’s claim that he was denied a full and fair evidentiary hearing by the trial court.
 

 PENALTY PHASE INEFFECTIVE ASSISTANCE OF COUNSEL
 

 Parker also claims that counsel provided ineffective assistance during the penalty phase of his trial for failing to investigate and present mitigating evidence relating to his mental health and his difficult childhood. The trial court denied relief on this claim, stating that it found “little difference between the penalty phase presentation at trial and the post-conviction presentation.” The court also found the testimony of the mental health experts who testified at the postconviction hearing was not credible. For the reasons explained below, we conclude that Parker has demonstrated both prongs of the
 
 Strickland
 
 standard for ineffective assistance of counsel during the penalty phase of trial and is entitled to a new penalty phase proceeding.
 

 During the penalty phase, Parker’s counsel presented five mitigation witnesses: two investigators who worked for the public defender’s office, Parker’s mother, Parker’s accomplice in the robbery, and one mental health expert. These witnesses testified that Parker’s childhood was chaotic and dysfunctional. His father abandoned the family when Parker was only a few months old; his mother was frequently hospitalized for serious mental
 
 *984
 
 problems; he spent his childhood in a series of foster homes; he was physically and sexually abused; and he has a long history of alcohol abuse and violent behavior. The State criticized the penalty phase testimony of the investigators for not being firsthand knowledge and criticized the testimony of the mental health expert because he relied almost entirely on Parker’s self-reported history and did not corroborate this information by interviewing collateral sources. In sentencing Parker to death, the trial court found no statutory or non-statutory mitigators had been established.
 
 Parker,
 
 641 So.2d at 377. The sentencing order found “nothing in the Defendant’s character or record to be in mitigation” and found “[n]o mitigating circumstances, statutory or otherwise, apply to the Defendant.”
 

 Also important to Parker’s claim of ineffective assistance by penalty phase counsel is the fact that on direct appeal this Court concluded that the evidence presented at the penalty phase was not enough to support the establishment of
 
 any
 
 nonstatutory mitigators.
 
 Id.
 
 We stated that the trial court “gave ample consideration to all of the evidence that Parker submitted in mitigation ... but found that the facts alleged in mitigation were not supported by the evidence.”
 
 Id.
 
 On postconviction appeal, however, we determined that Parker was entitled to an evidentiary hearing on this claim because it “appears that there is significant information that was never presented to the trial court which expounds upon both the abuse Parker suffered as a child and [his] mental infirmities.”
 
 Parker,
 
 904 So.2d at 378.
 

 At the evidentiary hearing, Parker presented testimony from numerous witnesses about his background and childhood. These witnesses fleshed out the “bare bones” presented at the penalty phase proceeding and provided a stark picture of Parker’s chaotic childhood: he was in and out of a series of foster homes; he had a bizarre and unpredictable life with a schizophrenic mother who was committed to mental hospitals repeatedly; he suffered physical and sexual abuse from his caretakers and from older children in the community; his education was disjointed because he attended over seventeen schools because he was moved from home to home; he has a poor academic record, a long history of substance abuse; and a record of violent and “crazy” behavior in school; Parker’s father did not participate in his life, having abandoned Parker and his mother when Parker was an infant. Parker’s trial counsel also testified that they had relied on the preliminary investigations by the public defender’s investigators who discontinued their work when the case was reassigned from the public defender’s office. Trial counsel admitted that they never requested school, employment, medical, or foster care records relating to Parker or medical records relating to his mother; nor were such background materials provided to the trial mental health expert. In fact, penalty phase counsel testified that he thought it was the doctor’s responsibility to seek out this information. Counsel did not interview individuals other than Parker, his mother, and his ex-wife who could corroborate Parker’s “horrific” childhood or background, even though this was the penalty phase defense strategy.
 
 Compare Burger v. Kemp,
 
 483 U.S. 776, 794, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) (concluding that counsel’s limited investigation was reasonable because he interviewed all witnesses brought to his attention, discovering little that was helpful and much that was harmful). The only investigator employed by Parker’s trial counsel was asked to investigate the victim’s background and guilt phase issues and never investigated anything related to Parker’s background or family.
 

 The ABA Guidelines provide that investigations into mitigating evidence “should
 
 *985
 
 comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.” ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), at 93 (1989). Among the topics that counsel should consider presenting in mitigation are the defendant’s medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences.
 
 Id.
 
 11.8.6, at 133. While trial counsel presented a “bare bones” rendition of some of these areas, it was not enough to establish mitigation even though there was a wealth of witnesses who were never interviewed and documents that were never sought that could have fleshed out and established the mitigating circumstances. The only investigation initiated by Parker’s trial counsel was limited to the victim’s background and possible guilt phase issues. In addition to this failure to conduct an adequate investigation, Parker’s counsel presented the information about his childhood and background through the hearsay testimony of the public defender investigators and not from first-hand sources.
 

 The evidentiary hearing testimony of the mental health experts also establishes that counsel was ineffective in presenting mental health mitigating evidence during the penalty phase. Clinical psychologist Dr. Glenn Caddy, who also testified at Parker’s penalty phase as a mental health expert, testified that he was given “quite sparse materials” related to Parker, and received no background records from counsel.
 
 [7]
 
 Prior to his postconviction testimony, Dr. Caddy reviewed two volumes of documents relating to Parker. While Dr. Caddy testified that he would not have changed his opinion as to the
 
 statutory
 
 mental mitigators based on these new background materials, he did change his opinion as to the severity of Parker’s mental and emotional impairment, which could have constituted nonstatutory mitigation. Further, he stated that had he known about the severity of the mother’s mental illness and her medical history, he would have conducted a more thorough evaluation of this issue. He also testified that had he seen Parker’s school records indicating significant behavioral and intellectual functioning problems, he would have recommended further evaluation and testing.
 

 Three other mental health experts testified at the postconviction hearing. These experts testified that Parker suffers from some level of neuropsychological impairment in his executive functioning ability, suffers from the effects of long-standing psychological deficits, and has a long history of behavioral disorders, and that his alcohol consumption exacerbates these problems. All three of the postconviction experts opined that the two statutory mental mitigators are applicable to Parker. The trial court discounted these opinions as “not credible.” However, even if we discount the opinions of the postconviction mental health experts as to the applicability of the statutory mental mitigators, these three experts presented uncontroverted evidence that Parker has some type of neuropsychological impairment that affects his executive brain functions. This was never presented at the penalty phase and would qualify as nonstatutory mitigation.
 

 In summary, had all of these facts been fleshed out or properly presented at the penalty phase, the trial court’s finding of
 
 *986
 
 no mitigation would not have been supported by the record. Accordingly, we conclude that Parker has met his burden under
 
 Strickland
 
 that counsel’s performance as to mitigation evidence was deficient and that he was prejudiced by the deficient performance. Thus, he is entitled to a new penalty phase proceeding where a jury is presented with the available mitigating evidence and weighs it in the sentencing calculus.
 

 CONCLUSION
 

 Accordingly, we affirm in part and reverse in part the trial court’s order denying postconviction relief. We remand this cause to the trial court for a new penalty phase proceeding before a jury.
 

 It is so ordered.
 

 QUINCE, C.J., PARIENTE and LEWIS, JJ., and ANSTEAD, Senior Justice, concur.
 

 CANADY and POLSTON, JJ., did not participate.
 

 WELLS, J., concurs in result only.
 

 [1]
 

 . Parker argued that: (1) the trial court erred in denying his challenges for cause to sixteen prospective jurors, four of whom served on the jury; (2) the trial court erred by requiring the parties to exercise their peremptory challenges simultaneously in writing; (3) three discovery violations occurred; (4) the trial court ignored his complaints about counsel's competency; (5) three errors occurred relating to guilt phase instructions; (6) there was improper closing argument by the State; (7) Parker was absent during a hearing on the State’s petition to issue an order to show cause for one of the robbery victims who failed to appear; (8) a killing during flight from the commission of a felony is not felony murder; (9) the trial court erred in denying Parker’s motion for a new trial based on a newly discovered witness who saw a deputy, and not Parker, shoot the victim; (10) the court erred in refusing to give Parker's requested special penalty phase instructions; (11) the prosecutor made improper comments during penalty phase closing argument; (12) the trial court relied on nonstatutory aggrava-tors; (13) the great risk and avoid arrest aggravators were not supported by the evidence; (14) the trial court erred in its consideration of the mitigating evidence; (15) Parker's death sentence is disproportionate; and (16) Florida’s capital sentencing scheme is unconstitutional.
 

 [2]
 

 . Huff v. State,
 
 622 So.2d 982 (Fla.1993).
 

 [3]
 

 . Parker asked this Court to determine whether: (1) the trial court erred by summarily denying his claims of ineffective assistance of guilt and penalty phase counsel; (2) the trial court improperly denied him access to public records; (3) the trial court's denial of his claims of ineffectiveness of counsel regarding juror misconduct and the rule prohibiting juror interviews was proper; (4) his claim of ineffectiveness of counsel relating to voir dire examination of jurors was properly denied; (5) counsel was ineffective for failing to preserve for appeal a claim of systematic discrimination in the selection of the jury; (6) the trial court properly denied his claim of ineffective assistance of counsel regarding the penalty phase instructions; (7) counsel was ineffective in failing to prove that the claim of a
 
 Caldwell v. Mississippi,
 
 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), violation was improperly denied; (8) his death penalty sentence is disproportionate to the crime for which he was convicted; (9) his sentence of death is being exacted pursuant to a pattern and practice to discriminate on the basis of race in the administration of the death penalty; (10) counsel was ineffective in providing the jury with adequate guidance concerning the aggravating circumstances instructions; (11) Florida’s capital sentencing statute is constitutional; (12) execution by electrocution or lethal injection is constitutional; (13) the combination of all errors deprived him of a fair trial; and (14) he is insane and cannot be executed. We did not address issues 5, 7, 9, and 11 because they were "bare-bones con-clusory allegations.”
 
 Parker,
 
 904 So.2d at 375 n. 3. We found issues 4, 6, 8, and 10 to be procedurally barred because they were raised on direct appeal.
 
 Id.
 
 We affirmed the denial of postconviction relief on issues 2, 3, 12, 13, and 14.
 
 Id.
 
 at 375.
 

 [4]
 

 .Parker argued that appellate counsel was ineffective for failing to raise the following issues on direct appeal: (1) the trial court's denial of his motion to disqualify the prosecutor based upon the prosecutor being a witness to the medical examiner’s alleged realization that he had made a mistake regarding the appearance of the bullet removed from the victim; (2) the penalty phase testimony of three witnesses resulted in relitigating the guilt phase issues, was irrelevant to the great risk aggravator, and constituted unconstitutional nonstatutory aggravating factors; (3) his absence during the suppression hearing; and (4) the lack of a specific charge against him because the State was permitted to prosecute him for both premeditated and felony murder. Parker also raised a number of challenges to his death sentence based on the Supreme Court's decision in
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
 
 Parker,
 
 904 So.2d at 381-83.
 

 [5]
 

 . The rule governing the disqualification of trial judges was previously numbered Florida Rule of Judicial Administration 2.160. It was renumbered as 2.330 in September 2006.
 
 See In re Amendments to the Fla. Rules of Judicial Admin.
 
 — Reorganization
 
 of the Rules,
 
 939 So.2d 966 (Fla.2006). Thus, the discussions in the pre-2006 cases cited refer to the previous numbering of the rule.
 

 [6]
 

 . Parker’s postconviction counsel admitted that she did not intend to call the prosecutor as a witness at the hearing. Counsel offered no argument or explanation as to Dr. Wright.
 

 [7]
 

 . In fact, the State was able to disparage Dr. Caddy’s trial testimony by eliciting that almost all of his information came from self-reports by Parker and a thirty-minute telephone conversation with Parker’s mother.