# Supreme Court of Florida

_____

No. SC16-1221
_____

**CRAIG ALAN WALL, SR.,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[February 22, 2018]

PER CURIAM.

This case is before the Court on appeal from convictions of first-degree murder and sentences of death. We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const. Based on the following, we affirm the convictions and sentences of death.

## FACTUAL AND PROCEDURAL BACKGROUND

Craig Wall, Sr., Appellant, was charged by indictment with two counts of first-degree murder for killing his fiancée, Laura Taft, on February 17, 2010, and their five-week old son, Craig Wall, Jr. (C.J.), on or between February 5 and 6, 2010. During six years of various court proceedings, Wall switched between pro se and attorney representation. Eventually, on February 13, 2015, Wall pleaded

guilty to Count One—the murder of Taft—and no contest to Count Two—the murder of C.J.

In his plea agreement, Wall agreed with the State that the death penalty was the appropriate sentence. Thereafter, Wall waived a penalty phase jury and proceeded pro se during the penalty phase, offering little mitigation. The trial court appointed independent special counsel for the purpose of presenting additional mitigation that may exist. On June 3, 2016, Wall was sentenced to death on both counts of first-degree murder.

## C.J.'s Death

Taft gave birth to C.J. on December 30, 2009. Wall, Taft, and C.J. all lived together, along with Taft's six-year-old son from a prior relationship, Connor, who lived with them part time. At around 7:30 a.m. on February 5, 2010, Taft left for work. About three hours later, Wall called 911 and reported that C.J. was not breathing. Paramedics arrived at around 10:45 a.m., and found that C.J. was not breathing, he was unresponsive, and cyanotic. C.J. was taken to the hospital, where doctors found bleeding in his eyes and brain, and also rib fractures. Doctors suspected that the injuries were caused by child abuse, so they reported the case to law enforcement who interviewed Wall. Detectives with the Clearwater Police Department questioned Wall about the events preceding C.J.'s death.

He indicated that Taft left their home around 7:30 a.m., and he was alone with C.J. between her departure and the paramedics' arrival. Wall claimed that when he awoke at about 10 a.m., C.J. was propped up on a pillow beside him in bed. He said that C.J. was wet and making noise like he was hungry. Then, Wall contended that he gave C.J. a bottle and left him on the couch in the living room, while he made himself breakfast. At that point, C.J. did not appear to be in crisis.

Wall told investigators that he heard C.J. cough and went back into the living room to find C.J. limp with his eyes "slitted like he was sleeping, but he wasn't." Wall started to change C.J.'s diaper and took him to the bathtub. According to Wall, C.J. was limp that entire time. Then, Wall ran cold water over C.J. to get him to respond. At one point, Wall blew into C.J.'s mouth and mucus came out of his nose. When Wall removed C.J. from the bathtub, he could hear his heart beating, but he did not detect breathing. Wall then placed C.J. on a bed and dried him off with a towel and a hair dryer set to low. Next, Wall brought C.J. back into the living room and attempted to squeeze his ribs because he did not know how to do CPR. Eventually, Wall placed C.J. on the floor and called 911.

During the interview, Wall was confronted with the fact that C.J. suffered a brain injury. Upon further questioning, Wall brought up the term "shaken baby syndrome." At various points, Wall vacillated between accepting blame for C.J.'s injuries and claiming not to know how they occurred. In fact, Wall stated, "I fu----

- 3 -

killed my son."[1]  Wall repeatedly stated that Taft was a good mother who had not

harmed C.J.

After being confronted with C.J.'s brain injury, Wall discussed a near car

accident.  On February 3, 2010, two days before C.J. became unresponsive, Taft

was nearly involved in a car accident with C.J. in the backseat, but she was able to

stop her vehicle in time.  Following that incident, Taft stopped the vehicle and

checked on C.J., who appeared fine.  Initially, Wall acknowledged that he did not

think that the near accident could have caused C.J.'s injuries, but later in the

interview he began suggesting that such event was the cause.  The same day as the

near accident, C.J. was circumcised.  Doctors told Wall not to feed C.J. for fifteen

minutes after the procedure, but Wall fed him a bottle in his truck anyway.

Following that, C.J. "threw up massively" in the truck.  The next day, February

4—one day prior to C.J. becoming unresponsive—Wall noted that C.J. had a

temperature of ninety-three degrees and that he regurgitated in his bouncy chair.

On February 5, after C.J. was taken to the hospital, Dr. Sally Smith

examined him.  C.J. had a hemorrhage on his brain, his pupils were dilated and

unreactive, and he had retinal hemorrhages.  This combination of injuries led Dr.

---

1. Upon viewing the entire interview, this statement was not a direct confession.  Wall was clearly a distraught father who knew that something terrible happened to his son while he had sole custody of the child.  However, it is not accurate—based on the context—to treat this as a direct confession.

Smith to suspect that someone physically abused C.J. Specifically, the injuries suggested "abusive head trauma," which is the result of "high-force acceleration/deceleration rotational trauma to the brain, often . . . by violent shaking, but [it] can be also caused in the course of the child being swung around." C.J.'s brain was so swollen that it protruded through an opening in the dura matter, which is a thick membrane covering the surface of the brain. An autopsy later determined that the cause of death was blunt-force trauma.

According to Dr. Smith, this type of brain injury would not be caused by a vehicle stopping when it never impacted another object. She continued, "Even with an impact, extensive bilateral retinal hemorrhages are exceedingly rare in any kind of car crash, let alone one that doesn't involve an impact." Dr. Smith concluded that an infant with C.J.'s injuries would not have been able to survive for twenty-four hours without medical attention if those injuries were caused by a car accident. In fact, Dr. Smith testified to a time frame for these injuries:

> In cases like this where the baby died of these injuries, the progression to that sort of critically ill condition and impending death would occur probably within minutes of the original trauma. It might be an hour or two, but it would be quickly following injury to the brain.

An infant with C.J.'s injuries would not have been able to drink a bottle, and would only be able to make certain noises such as grunting or gasping for air. Thus Dr. Smith testified that it would be "highly unlikely" for a child to still be alive at 10:45 a.m. having received C.J.'s injuries prior to 7:30 a.m.

Dr. Thogmartin, Wall's witness, opined that any brain injury from the birthing process could be completely ruled out as the cause of death. Further, Dr. Thogmartin testified that while rebleeding may occur in old brain injuries, an injury would not rebleed to the extent of a chronic subdural hematoma. In Dr. Thogmartin's opinion, C.J. suffered a brain injury about one week prior to his death, but was reinjured "right around the time of death." Also, Dr. Smith noted C.J.'s rib fractures. These fractures were posterior fractures, adjacent to the spinal column, which "are highly specific for child abuse as the cause." Because infant ribs are somewhat flexible, posterior rib fractures are not caused by CPR. Instead, posterior rib fractures in infants are caused by "high force compression or distortion-type forces applied to the ribs where they end up breaking across the adjacent spinal." Dr. Thogmartin testified that these fractures were not from CPR; rather, this was a "squeeze the life out of the rabbit squeeze" most likely from an "extreme inflicted injury."

On February 6, 2010, C.J. died.

Interim Time Between C.J.'s and Taft's Deaths

Later in the day on February 6, Wall ingested sleeping pills to attempt suicide. He made an emotional suicide video where he denied harming C.J. Taft called law enforcement, after which Wall was involuntarily committed to state custody on mental health grounds and taken to Morton Plant Hospital.

On February 8, 2010, Taft filed a petition for temporary injunction against Wall, citing domestic violence as the basis for the injunction. The injunction was granted, and it was served on Wall on February 9, 2010, while he was still in the hospital. The next day, Wall was released. He sought emergency hearings on the injunction to allow him to attend C.J.'s funeral; however, the court was unable to schedule a hearing on such short notice. So, on February 14, 2010, Wall violated the injunction and attended C.J.'s funeral, where he was arrested for the violation.

While being transported to jail, Wall spoke with a fellow arrestee, Danny Welker. According to Welker, Wall told him that Taft "was lying, lying about him and that he was going to choke the life out of her when he got out of jail." When Welker suggested that Wall was exaggerating, Wall informed him that he was not. Wall was released from custody on February 15, 2010. By then, Taft had already moved out of their shared apartment to a different residence.

Taft's Death

At about 3 a.m. on February 17, 2010, Taft's upstairs neighbor, Christopher Thompson, returned home from working the late shift. Thompson noticed a person sitting in a red vehicle. That person, a male, exited his vehicle, walked away, and then returned. Thompson continued into his apartment, and, upon lying down for bed, he heard glass shatter directly below his residence. "Within less than 10 or 15 seconds" of the glass breaking, Thompson heard the "fearful" and "distressed

- 7 -

yelling" of a female. According to Thompson, the yelling continued for thirty to forty-five seconds. Thompson attempted to call 911 and knocked on his roommates' door to wake them up. Then he exited his front door and saw the same male he had seen earlier walking toward the same red vehicle from the apartment below. The man looked back over his shoulder and Thompson saw him face-to-face. However, the man did not stop; instead, he got into his vehicle and drove off.

Downstairs, Thompson found Taft in a seated position leaning against a wall beside the doorway. Thompson tried to speak to Taft, but he could only hear "gurgling noises from her throat." Despite his efforts, Thompson could not tell if Taft had a pulse. By that point, Thompson's roommate was already on the phone with 911. The police arrived and took Thompson to the police station to identify the man that he saw leaving the scene. There Thompson identified Wall.

The trial court found that Wall, armed with an "assault style" knife, broke Taft's rear sliding glass door. Then, Wall confronted Taft, and he violently attacked her. The final blow, which was delivered to her left shoulder, was delivered with enough force that the knife blade separated from the handle and remained lodged inside her. The fatal wound was a stab to her torso that entered her heart. Moreover, Taft evidenced multiple defensive wounds.

## Procedural History

This case has a long, convoluted procedural history, most of which is irrelevant to our decision today. Thus we only include the portions relevant for these proceedings.

Wall initially sought hybrid representation, with trial counsel representing him as to C.J.'s death and Wall representing himself as to Taft's death. At a hearing on February 27, 2013, the trial court denied Wall's request for self-representation.

A defense motion on April 12, 2013, to have Wall transported for a psychological examination was denied. Wall took exception to the State's comment that he might attempt to escape during transport. In response, Wall said, "You people are really idiots." The trial court warned Wall about his behavior and, after a back-and-forth exchange, Wall asked the trial court, "Are you done?" The trial court again warned Wall that he would be removed from the courtroom if he disregarded the rules. The hearing continued and Wall later said, "[Y]our Honor was being, for lack of a more legal term, a dick." As the hearing was ending, the trial court thanked Wall, to which Wall responded, "I tried to spare you." At that point, the trial court stated:

> *Hopefully, the Supreme Court appreciates the patience that I'm attempting to show in this situation* because that's what I'm trying to do every time we're on the record as far as that's concerned. All right. You guys have a good weekend.

(Emphasis added.)

On May 1, 2013, Wall again moved for a *Faretta*[2] hearing due to a disagreement with counsel, which the trial court refused to hear. The trial court then removed Wall from the courtroom due to his behavior. Trial counsel noted that the defense had not requested the appointment of a psychologist because Wall had refused to participate. The trial court stated that Wall should be evaluated, or at least an attempt should be made at an evaluation. Thus the trial court appointed Dr. Poorman, the jail psychologist, to evaluate Wall to determine if he was competent for self-representation. On May 29, 2013, Dr. Poorman's report indicated that Wall was not competent to represent himself, and Wall requested to be transferred to Florida State Hospital for treatment and potential reevaluation. Wall filed a motion to remove counsel, and on July 18, 2013, that motion was denied along with Wall's request to proceed pro se. By a pretrial hearing on August 29, 2013, Wall's security status changed because he threatened to kill his attorneys, so he remained cuffed and shackled in court. Wall claimed it would be easier for him to proceed pro se because counsel was not communicating with him, but the motion was denied.

---

2. *Faretta v. California*, 422 U.S. 806 (1975).

Again, at a pretrial hearing to remove counsel on December 13, 2013, Wall complained of a disagreement with trial counsel. Specifically, Wall disagreed with counsel's desire to pursue a psychiatric defense and would not cooperate with the psychologist: "[F]irst of all, you know, supposedly I'm this evil white supremacist. I ain't talking to no fu----- Jew. So you stop sending Eisenstein at me." The trial court explained to Wall that his goal of receiving the death penalty was inconsistent with trial counsel's responsibility to mount a defense and the concept of pleading no contest to C.J.'s death was discussed. Then Wall raised case law from Indiana where a court had allowed a defendant to plead guilty in exchange for the death penalty. That offer was presented by Wall to the State but was rejected.

Trial counsel explained that the psychologist's religion would not make a difference as Wall was determined not to cooperate or speak to any psychologist, which Wall confirmed. Wall then suggested that Dr. Poorman evaluate him again, which he would comply with as long as it was an evaluation before a *Faretta* hearing. During the course of the hearing, the trial court said to Wall, explaining a previous in camera hearing: "You can second-guess me. The Supreme Court will have every chance to second-guess me. I don't have any issue with that."

At the following hearing, on December 20, 2013, Dr. Poorman testified that Wall was competent to represent himself. Her earlier determination in May 2013, that he was not competent to self-represent, was based on his behavioral issues,

- 11 -

hunger strikes, and unwillingness to cooperate with the evaluation. However, on December 20, 2013, Dr. Poorman testified that Wall had the ability to represent himself with the caveat that he would need to control his vulgar language. Wall indicated that he wanted to dismiss counsel and get new attorneys. When the trial court asked if he wanted a *Faretta* hearing, he responded that he had no choice. The trial court noted that there was no sufficient basis to remove counsel, so Wall chose to proceed pro se. The trial court then conducted a *Faretta* hearing. However, Wall's attorneys were ordered to remain on the case as standby counsel over Wall's objection. Wall saw no difference in that structure, so he decided to keep representation by counsel and did not proceed pro se.

When Wall disagreed with the trial court appointing a mitigation specialist, he became irate:

> I can't verify that she'll live. Straight up. That bitch is—no. I can't even verify that she'll breathe another day, including [trial counsel]. Establish that. I might as well just go ahead and go all in.

When the trial court ordered Wall removed from the courtroom, Wall screamed back into the courtroom. After that comment, the trial court remarked that hopefully this Court will review that outburst if the case came here. On February 7, 2014, at a *Faretta*/*Nelson*[3] hearing, Wall indicated his displeasure with trial

_____

3. *Nelson v. State*, 274 So. 2d 256 (Fla. 4th DCA 1973).

counsel and noted that he was in the psychiatric unit under suicide watch.  Later, Wall decided to proceed pro se again.

On March 6, 2014, the trial court reaffirmed that Wall wished to proceed pro se.  Then the trial court denied Wall's motion for continuance.  The trial court reminded Wall that he had been warned a continuance would not be granted due to lack of preparation.  At that point, the trial was scheduled for about one month later and the parties had been previously discussing pro se representation for six to eight months.  The trial court explained that Wall repeatedly admitted to murdering Taft and stated multiple times that he wanted to receive the death penalty.  Wall responded, "Let's make a deal."  To which the trial court responded:

> No, your dispute has been with the death of the child and whether you're legally responsible for that, and my understanding is that all of those experts that have been listed are going to be called. The State does not need to take their depositions.
>
> So your defense, as far as the death of the minor child, is going to be based on the testimony of those experts, right?
>
> . . . .
>
> So I fail to understand how you can't be ready, if the State is not deposing those experts and you've already acknowledged responsibility for the death of Ms. Taft; and, in fact, want to receive the ultimate penalty for the death of Ms. Taft.
>
> . . . .
>
> . . . [A]nd the defense that you want to present is that you're not responsible for the death of the minor child; am I accurate in that?

Then Wall stated, "No, not anymore. . . . As far as I'm concerned, aliens beamed me up and then left me in the car with blood on me . . . ." Wall suggested that his strategy made him a "mad genius" and that perhaps he actually was using reverse psychology to avoid the death penalty. The trial court denied the continuance, and, to avoid a lengthy procedure, Wall again unsuccessfully sought to have the State dismiss the case regarding C.J. in exchange for the death penalty.

On April 4, 2014, Wall filed a pro se motion to disqualify the trial court. As grounds, Wall asserted that the trial court was biased against him and that it had already predetermined his death sentence. Wall claimed that he only discovered the basis for the motion on March 26, 2014, when transcripts were delivered to him. However, the statements that Wall took issue with were the trial court's mention of this Court reviewing the case, which were made on April 12, 2013, and December 13, 2013, respectively. The trial court denied the motion to disqualify as legally insufficient. After orally denying the motion on April 4, 2014, the trial court informed the parties that trial would commence the following week. A later petition for a writ of prohibition to the Second District Court of Appeal regarding the denial of Wall's motion to disqualify was also denied.

On April 7, 2014, the morning of jury selection, Wall asked for reappointment of counsel, claiming that he was not prepared. Trial counsel requested a continuance, which was granted. Trial was set for October 2014.

However, during an October 29, 2014, pretrial hearing, Wall again moved to discharge counsel and requested a *Nelson* hearing. The trial was pushed back to February 2015 and counsel was instructed to continue to prepare. At the *Nelson* hearing, the trial court did not discharge counsel, so Wall requested another *Faretta* hearing, which the trial court delayed to be held later if necessary.

At February 6 and 11, 2015, hearings, the parties discussed a possible plea of guilty as to Taft's murder and no contest as to C.J.'s. However, Wall demanded to condition his plea on receiving the death penalty, and if he did not receive it, he wanted the option to withdraw the plea. Eventually, the State refused to agree to a conditional plea, which would allow Wall to withdraw. The State was concerned that the entire strategy was a ploy to drag the case out even longer and that this Court would disapprove of the procedure.

During these hearings, the trial court discussed the logistics of a possible plea and the penalty phase. The trial court indicated that it would be best to have a psychologist evaluate Wall. It was decided that Dr. Poorman would evaluate Wall prior to a plea, along with another psychologist, Dr. Gamache, depending on availability. Trial counsel stated that Dr. Poorman had already determined Wall was competent. Also, trial counsel indicated that it was not necessary to have Dr. Gamache evaluate Wall for the plea. The trial court stated that it would rather

have Wall reevaluated prior to any plea. Dr. Gamache never evaluated Wall; however, Dr. Poorman was eventually able to conduct another evaluation.

On February 13, 2015, Wall signed a plea agreement—despite the State's rejection of his conditional plea offer. The plea stated:

> *The State and I agree to the death penalty in this case. Both parties agree that the aggravating circumstances outweigh the mitigating circumstances and that death is the appropriate sentence. However, both parties understand that the Court will determine the sentence pursuant to Florida Statutes.*

(Emphasis in original.)

On February 13, 2015, the trial court held a change of plea hearing and questioned Dr. Poorman to determine if Wall was competent to plead. Dr. Poorman testified that Wall was competent and was aware of the penalties. Dr. Poorman stated that Wall understood the rights that he was forfeiting by pleading instead of proceeding to trial. Moreover, Dr. Poorman opined that Wall was competent to proceed to trial and represent himself. All criteria for self-representation were satisfied, and Dr. Poorman had no concerns about Wall's literacy, verbal ability, or overall intelligence.

The trial court conducted a thorough plea colloquy and ensured that Wall understood the rights that he was forfeiting and that the trial court would ultimately determine the appropriate sentence. Wall admitted that he previously attempted suicide, but stated that he was not suicidal. Trial counsel stated that he was

- 16 -

prepared to mount a defense for Wall and did not recommend that he accept the plea, but that he was respecting Wall's position. The trial court accepted the plea, adjudicated Wall guilty, and proceeded to a *Faretta* hearing because Wall intended to proceed pro se at the penalty phase.

<u>Wall's Mitigation</u>

While representing himself at the penalty phase, on February 23, 2015, Wall waived a penalty phase jury. Wall presented some mitigation on his own. He offered various photographs and videos including one depicting him with Taft together as a family at Christmas. Also, Wall called his friend and an acquaintance to testify as to his character.

Wall noted that he was born out of wedlock, had a difficult childhood, and claimed that various family members exhibited signs of mental instability. He stated that he protected his siblings from their mother who would beat them. In closing, Wall asserted that he did not kill C.J., but acknowledged that his no contest plea would not rebut the State's evidence. According to Wall, he was distraught and losing his mind when he murdered Taft. Finally, Wall reiterated that he did not harm C.J. and only tried to save him.

After Wall's closing, the trial court appointed independent special counsel because there was potential mitigation related to mental health, family, and prior incarceration that Wall did not present. The trial court explained that Wall himself

argued that he was under the influence of extreme mental and emotional disturbance and was unable to conform his conduct to the law when he murdered Taft. The trial court ordered special counsel to determine if additional mitigation should be presented and ordered a comprehensive presentence investigation report (PSI). Wall objected to having special counsel and refused to reply to discovery requests.

### *Spencer*[4] Hearing

A mitigation specialist, Felicia Sullivan, testified that she was not able to complete a biopsychosocial study—looking at a person's biology, social environment, and psychology—because Wall would not comply. Sullivan interviewed Wall's mother, maternal uncle, and maternal aunt. However, some family members, including Wall's biological father, refused to be interviewed.

Wall's mother, Candace Wall Zilich, alleged that when Wall was two years old her friend, Kathy Jones, molested him. Sullivan was unable to contact Jones, despite several attempts. Zilich claimed that child protective services investigated and determined that Jones sexually abused Wall; however, Jones was never charged. Yet Sullivan never located any record of this besides various psychiatric reports throughout Wall's life. Zilich believed that Wall's biological father spent

---

4. *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

time in an institution and his father's twin brother also spent time in a mental institution. Zilich's sister had been institutionalized, along with Wall's uncle, who received electroshock therapy.

In 1982, Wall was admitted to Hamot Medical Center on an outpatient basis because he was having behavioral problems in school. There was a full admission to Hamot in April 1983. After two weeks, he was discharged, but was readmitted in August 1983. A brain scan from that hospitalization reflected irregularities that were not followed up on, and Sullivan stated that knowledge would have led her to order another brain scan and a full battery of neuropsychological testing. Sullivan testified that Zilich spanked, slapped, and cussed at Wall. Zilich would make Wall stand with his hands above his head as she threw shoes at him until a pile of them was gone, then she would make him collect the shoes and start over. By age eight, Wall was on several medications. At one point, Wall was admitted to Western Psychiatric Institute because he was having trouble with the medication, and they attempted to stabilize him. However, in December 1983, Zilich noted that Wall's behavior became "increasingly strange" despite the medication.

His family moved to Florida when Wall was nine and although he was seeing a psychiatrist in Pennsylvania, that discontinued upon moving to Florida. A memo from a Pinellas County School Board meeting reflected that Wall was placed into the severely emotionally disturbed program. In 1985, Wall was

evaluated by a psychiatrist and sent to R.L. Sanders, a school for emotionally disturbed children. Wall was committed to Pinellas Emergency Mental Health in February 1988. At fifteen, Wall attended Dozier School for Boys. During his time there, Wall was taken to the emergency room for stiches to close a wound.

At age eighteen, Wall was sentenced to prison. Department of Corrections (DOC) mental health records for Wall stretch from 1994 to 2008. Those records indicate that Wall believed he was sexually abused by his babysitter and that Zilich physically abused him. Wall was released from prison on September 3, 2008. In prison he was treated with medication, but there is no record that continued following his release.

During a lunch break on the first day of the *Spencer* hearing, Wall had a disagreement with multiple bailiffs and threatened them. Upon returning from lunch, Wall entered the courtroom and stated, "I hope I don't get a hold of a knife." After being combative with the trial court, Wall was removed from the courtroom and restrained in a courtroom next door to watch the proceedings on a television. Yet Wall was allowed to return and represent himself on the second day of the *Spencer* hearing.

Erica Dalquist, a mental health counselor, investigated Wall's childhood trauma. She testified that there were plausible causes of severe trauma, including abandonment by his biological father, sexual abuse, physical abuse,

overmedication, and improper detoxing off the medications. Exacerbating these problems, Wall did not have an adult to rely on and he would act out by setting fires beneath his bed. Long exposure to these stressors can adversely affect how a child's brain develops and may result in an adult who is violent, unpredictable, and lacking impulse control. According to Dalquist, whether Wall's sexual abuse occurred is irrelevant because telling a child they were sexually abused could be as traumatic.

Dalquist noted that Wall grew up in a chaotic home and his mental illness was not consistently treated. Moreover, she stated that it is uncommon for five- and six-year-old children to receive the type of psychotherapy and medication that Wall received. Wall was in crisis as a child, which resulted in his acting out at school and even his behavior in court the day Dalquist testified. Wall was the oldest and only biological child that Zilich had with Wall's biological father, and his siblings' father was Wall's stepfather. Dalquist testified that there is often a "scapegoat" child in abusive homes, so Wall may have suffered abuse greater than his siblings.

Dr. Daniel Buffington, a clinical pharmacologist, reviewed Wall's medical and psychiatric records, although they were incomplete. Dr. Buffington had concerns about the inconsistent treatment and how the combinations of medications at a young age were a risk factor for long-term neuro-pathway

damage. Dr. Buffington identified the following psychiatric disorders in Wall: bipolar, attention deficit hyperactivity, anger management, impulse control, hostility, irritability, frustration intolerance, antisocial personality, and suicide. Wall's childhood medications reflected advanced psychiatric conditions.

A psychiatrist noted that by age ten, Wall's medication was excessive compared with a minimal amount of psychiatric counseling. By age twelve, the medications prescribed to Wall would have impacted his brain development. DOC records reflect the "clinical futility" of identifying the medications, alone or in combination, that would stabilize Wall despite the multitude of prescriptions. Dr. Buffington found two statutory mitigators: Wall was under the influence of extreme mental or emotional disturbance, and other factors, such as Wall's mental health background, mitigate against the death penalty.

Wall introduced all of his DOC records, which showed numerous disciplinary reports issued against Wall. Also, he introduced a video of a jail guard beating him and calling him a "baby killer."

Wall called additional witnesses. John Bredeson, Taft's father, testified that Wall and Taft appeared to have a good relationship, but often disagreed. Further, he stated that Wall played with Connor and attempted to be a good father to him. Finally, Bredeson stated that he did not want Wall to die, instead preferring that he live in the prison general population without a chance of parole.

Rhonda Buttita, Taft's mother, found out Wall was a convicted felon despite Taft not telling her Wall's last name when she discovered they were dating. Buttita thought that Wall cared for Connor like a stepfather, but she disliked Wall when he was with Taft. At the hospital, Buttita heard Wall crying about C.J. Buttita gave a victim impact statement and wanted to see Wall receive the death penalty.

Buttita's husband, Andrew Buttita, visited Wall's apartment, noting that it was clean. Andrew Buttita stated that Wall bought a Christmas present for him. However, he considered it difficult to call Wall thoughtful after Wall murdered Taft and C.J. Moreover, he believed Wall was a threat to other inmates and that it would be best for society if Wall was executed.

Wall introduced his Myspace page to show that he was social. Wall stated that he cared for his younger brother and that taught him how to feed C.J. and change his diapers. Wall testified that Jones never molested him and that Zilich made those accusations to get rid of Jones to allow Zilich to abuse him. Also, he accused Zilich of falsely claiming that he was homosexual and a child molester, attempting to "destroy" him at every chance.

Wall detailed the injuries that he suffered from Zilich: a broken jaw, ruptured eardrum, teeth knocked through his mouth, and being punched in the head

and knocked head-first into a dresser. Wall claimed that Zilich would lie about the abuse to others and tell Wall that she would "fucking kill [him]" if he told anyone.

Sentencing Order

In sentencing Wall to death, the trial court found the following aggravators proven beyond a reasonable doubt as to Taft's murder: (1) Wall's previous conviction for another capital felony or a felony involving the use or threat of violence to a person—*very great weight*; (2) the capital felony was committed while Wall was engaged in the commission of an armed burglary or burglary—*great weight*; (3) the capital felony was especially heinous, atrocious, and cruel (HAC)—*very great weight*; and (4) the capital felony was committed in a cold, calculated, and premeditated (CCP) manner without the pretense of moral or legal justification—*great weight*. As to C.J.'s murder, the trial court found the following aggravators proven beyond a reasonable doubt: (1) Wall's previous conviction for another capital felony or a felony involving the use or threat of violence to a person—*very great weight*; (2) the victim of the capital felony was less than twelve years of age (merged with the aggravated child abuse aggravator); (3) the capital felony was committed while Wall was engaged in the commission of aggravated child abuse—*great weight*; and (4) particularly vulnerable victim (PVV) because Wall stood in a position of familial or custodial authority over the victim—*very slight weight*.

In mitigation, the trial court found one statutory mitigator established as to Taft's murder, which was afforded *moderate weight*—the capital felony was committed while Wall was under the influence of extreme mental or emotional disturbance—and no statutory mitigators established for C.J.'s murder. Also, the trial court found seven nonstatutory mitigators established, which were relevant to both murders: (1) Wall attempted to create a familial lifestyle for his family—*very slight weight*; (2) Wall is capable of cultivating interpersonal relationships—*slight weight*; (3) Wall was abused by his mother and attempted to shield his siblings from her abuse—*slight weight*; (4) Wall suffers from a mental illness and received inconsistent mental health treatment from early childhood—*some weight*; (5) Wall suffered from significant childhood trauma and abuse—*some weight*; (6) Wall's prolonged institutionalization from a young age—*slight weight*; and (7) Wall's familial pattern of mental illness—*very slight weight*.[5]

The trial court weighed the aggravators against the mitigators and found that the aggravators "far outweigh" the mitigators. Accordingly, the trial court entered a death sentence on each count of first-degree murder.

---

5. The trial court also rejected three nonstatutory mitigators as not established or not mitigating: (1) Wall's ability to acclimate to prison life and jail conduct; (2) photographic evidence of the crime scene and autopsy; and (3) testimony of Dr. Thogmartin.

Post-Sentencing Procedural History

On January 26, 2017, Wall's appellate counsel filed a motion to withdraw because Wall insisted that they argue in favor of death. In a February 16, 2017, order, we denied that motion, but we allowed Wall to set forth his "personal positions and interests" in a pro se supplemental brief.

**ANALYSIS**

There are four issues that we will address: (1) whether the trial court erred in failing to order a competency evaluation prior to accepting the plea; (2) whether the trial court erred by failing to recuse itself upon a motion to disqualify; (3) the voluntariness of the plea; and (4) the proportionality of the death sentences. Because we find no error, we affirm.

Competency Evaluation

Wall challenges the trial court's procedure for his competency evaluation. However, because he was evaluated and determined to be competent, his claim is groundless.

During "any material stage" of a criminal proceeding, a defendant must immediately be examined for competence if the trial court "has reasonable ground to believe that the defendant is not mentally competent to proceed." Fla. R. Crim. P. 3.210(b); *see Dessaure v. State*, 55 So. 3d 478, 482 (Fla. 2010). If that sufficient basis exists, the trial court "shall immediately enter its order setting a

time for a [competency] hearing . . . and may order the defendant to be examined by no more than 3 experts, as needed, prior to the date of the hearing." Fla. R. Crim. P. 3.210(b). However, "[o]nce a defendant has been deemed competent, the presumption of competence continues throughout all subsequent proceedings." *Dessaure*, 55 So. 3d at 482-83. And a "subsequent competency hearing is only required 'if a bona fide question as to the defendant's competency has been raised.' " *Id.* at 483 (quoting *Boyd v. State*, 910 So. 2d 167, 187 (Fla. 2005)). The competency standard for pleading guilty or waiving the right to counsel is the same as the basic *Dusky v. United States*, 362 U.S. 402 (1960), competency standard for standing trial. *Godinez v. Moran*, 509 U.S. 389, 396-97 (1993); *Gill v. State*, 14 So. 3d 946, 959 (Fla. 2009). That competency standard "has a modest aim: It seeks to ensure that [defendants have] the capacity to understand the proceedings and to assist counsel." *Godinez*, 509 U.S. at 402. Under *Edwards v. Indiana*, 554 U.S. 164 (2008), there is a heightened competency standard for actually representing oneself at trial; thus defendants may be competent to waive counsel yet incompetent to represent themselves. *Id.* at 177-78; *Larkin v. State*, 147 So. 3d 452, 465 (Fla. 2014).

Here, Wall was deemed incompetent to represent himself in May 2013; however, in December 2013, Dr. Poorman deemed Wall competent to represent himself, which the trial court accepted. The sole caveat resulting from Dr.

Poorman's competency evaluation was that Wall would need to control his vulgar language in court. In fact, Dr. Poorman evaluated the heightened competency standard articulated in *Edwards* when she conducted Wall's competency evaluation, which is higher than the plea competency standard:

> [Trial court]: Can you share with us your thoughts as to his possibilities of whether self-representation is something that's viable?
>
> [Dr. Poorman]: Yes, Your Honor. And this is based upon the pro se ruling, Indiana versus Edwards. As the Court knows, the bar is a little bit higher with regards to pro se.
>
> So the areas that I assessed Mr. Wall on included his appraisal of his legal defenses; his ability to plan legal strategy; his ability to question and challenge witnesses; his willingness for standby counsel, which is mandatory; and his motivation for wanting to go pro se.
>
> . . . .
>
> And I do think that based upon those five criterion that he does have the ability to represent himself.

From that point on, Wall's presumption of competence continued throughout the time that he entered his plea. *See Dessaure*, 55 So. 3d at 482-83; *Boyd*, 910 So. 2d at 187; *Durocher v. Singletary*, 623 So. 2d 482, 484 (Fla. 1993). Regardless, the trial court ordered another competency evaluation to further ensure that Wall was competent to plead. Again, Dr. Poorman found Wall competent to plead:

> [Dr. Poorman]: My opinion is, based upon my interview of him, that he remains competent to proceed to trial.
>
> [Trial court]: And as far as the understanding the penalties and what he's seeking as far as the penalties concerned?

- 28 -

[Dr. Poorman]: Absolutely, he is very much aware of the death penalty, and if he were to go to trial, possibly a life sentence if he were convicted.

[Trial court]: And he expressed to you that he wants to go forth with the penalty that has been announced here today?

[Dr. Poorman]: He did.

[Trial court]: Do you feel he is competent he can make that decision?

[Dr. Poorman]: I do.

. . . .

[Trial court]: Okay. And so you're comfortable that he meets all the standards as far as competency is concerned? You've opined that previously for other purposes, both to stand trial and for purposes of self-representation, right?

[Dr. Poorman]: Correct.

As the record demonstrates, Wall was competent to enter the plea. On appeal, Wall takes issue with the fact that the trial court initially suggested that another psychologist, Dr. Gamache, should also evaluate Wall. Dr. Gamache never evaluated Wall, but that fact is irrelevant. Wall had multiple competency evaluations with Dr. Poorman and was found to be competent. Florida Rule of Criminal Procedure 3.210(b) does not require multiple doctors to evaluate a defendant for competency; rather, it states that "no more than 3 experts" may evaluate a defendant when the trial court has "reasonable ground" to believe that the defendant is incompetent. Furthermore, Wall's trial counsel agreed that there

was no need to have Dr. Gamache conduct a competency evaluation because Dr. Poorman already conducted one and Wall had a "very clear understanding" of the proceedings. Wall makes absolutely no showing that any of Dr. Poorman's evaluations were insufficient or that she was unqualified to conduct an evaluation. Rather, without any justification, Wall simply maintains that we should require more doctors to conduct heightened competency evaluations. We decline to do so.

Thus the trial court committed no error.

<u>Motion to Disqualify</u>

Wall contends that the trial court's failure to recuse itself upon motion amounts to reversible error. His claim fails for two reasons: (1) the motion was properly denied as time-barred; and (2) the motion did not demonstrate a well-founded fear of judicial bias.

Section 38.10, Florida Statutes (2014), provides substantive entitlement to have a presiding judge who is free of bias or prejudice against either party. *Id.*; *Cave v. State*, 660 So. 2d 705, 708 (Fla. 1995). The procedural requirements of filing a motion to disqualify the trial court are prescribed by Florida Rule of Judicial Administration 2.330. *Cave*, 660 So. 2d at 708. Specifically, the motion must be written, alleging certain facts, and filed "within a reasonable time not to exceed 10 days after discovery of the facts constituting the grounds for the motion." Fla. R. Jud. Admin. 2.330(c)-(e). Upon receiving a motion, the trial

court "shall determine only the legal sufficiency of the motion and shall not pass on the truth of the facts alleged." Fla. R. Jud. Admin. 2.330(f); *see Parker v. State*, 3 So. 3d 974, 982 (Fla. 2009). The legal sufficiency of a motion to disqualify is a question of law, which this Court reviews de novo. *Barnhill v. State*, 834 So. 2d 836, 843 (Fla. 2002).

First, Wall's motion to disqualify the trial court was properly denied as legally insufficient because it was time-barred. Wall based his motion to disqualify on the statements that the trial court made—relating to this Court's review—during hearings on April 12, 2013, and December 13, 2013. Yet Wall filed the motion on April 4, 2014, which is well outside of the ten-day time limit on motions to disqualify. Fla. R. Jud. Admin. 2.330(e) (stating that motions "shall be filed within a reasonable time not to exceed 10 days after discovery"). Both then and now, Wall sought to circumvent the time limitation by claiming that he only discovered the statements when he received transcripts of the proceedings on March 26, 2014. As it pertains to the December 13, 2013, hearing, this claim is flatly false. The record demonstrates that Wall was present and responded to the trial court's statement at issue:

> [Trial court]: I'm just telling you, I'm trying to balance competing interests here to get to the right decision. You can second-guess me. *The Supreme Court will have every chance to second-guess me.* I don't have any issue with that.
>
> [Wall]: *Right.*

- 31 -

> [Trial court]: You make your call, you listen and you make the best call you can.
>
> [Wall]: Okay. Go ahead and—

(Emphasis added.) Therefore, Wall clearly knew the basis for this claim on December 13, 2013, well before March 26, 2014, as he later claimed.

In regard to the April 12, 2013, hearing, the trial court's statement was a direct response to Wall's derogatory comment. Therefore, it appears that Wall was present and heard the statement:

> [Wall]: Thank you, sir.
>
> [Trial court]: Thank you.
>
> [Wall]: I tried to spare you.
>
> [Trial court]: *Hopefully, the Supreme Court appreciates the patience that I'm attempting to show in this situation* because that's what I'm trying to do every time we're on the record as far as that's concerned. All right. You guys have a good weekend.
>
> (WHEREUPON, THE HEARING CONCLUDED.)

(Emphasis added.) Unlike other portions of the record, where it was clear that Wall was removed from the courtroom—generally after several warnings—this part of the record contains no indication that Wall was removed or left prior to the trial court's response. As a result, it is clear that Wall was aware of this basis for his motion on April 12, 2013, which was almost a year prior to his motion to disqualify.

- 32 -

Therefore, Wall's motion to disqualify was properly denied as legally insufficient due to the ten-day time bar. Second, even without the time bar, Wall's motion was legally insufficient because he did not have a well-founded fear of judicial bias.

"The term 'legal sufficiency' encompasses more than mere technical compliance with the rule and the statute." *Parker*, 3 So. 3d at 982. "The standard for viewing the legal sufficiency of a motion to disqualify is whether the facts alleged, which must be assumed to be true, would cause the movant to have a well-founded fear that he or she will not receive a fair trial at the hands of that judge." *Id.* "Further, this fear of judicial bias must be objectively reasonable." *Id.* In *Gregory v. State*, 118 So. 3d 770 (Fla. 2013), we noted that "a movant cannot simply pluck one word from a full sentence made by the trial judge" to make a motion to disqualify legally sufficient. *Id.* at 780. Thus the context of the hearing and history of the case as reflected in the record are relevant to understanding whether a movant has a well-founded fear of judicial bias. *See Asay v. State*, 769 So. 2d 974, 980-81 (Fla. 2000) (looking at the context of two statements to determine legal sufficiency); *Quince v. State*, 592 So. 2d 669, 670 (Fla. 1992) (finding no error in the denial of a motion to disqualify after looking at the context of the statements and the resulting history).

At the end of the April 12, 2013, hearing, the trial court stated,

Hopefully, the Supreme Court appreciates the patience that I'm attempting to show in this situation because that's what I'm trying to do every time we're on the record as far as that's concerned.

Although the statement mentions this Court, it came after Wall slung various insults at the trial court. For instance, Wall said to the trial court during that hearing, (1) "You people are really idiots"; (2) "Are you done?"; and (3) "[Y]our Honor was being, for lack of a more legal term, a dick." This Court has warned trial judges to always "convey the image of impartiality to the parties and the public." *Peek v. State*, 488 So. 2d 52, 56 (Fla. 1986). However, such a directive does not relegate trial judges to be the whipping boys and girls of unhappy litigants. Wall's behavior over the course of these six-year proceedings can only be described as vile. He was consistently out of line during the entire April 12 hearing, and the trial court's statement was only prompted when Wall inexplicably stated, "I tried to spare you." We cannot conclude that the court's human response rises to the level of demonstrating a well-founded fear of bias. Without condoning these comments, we note our prior excusal of isolated mention of this Court by trial courts in death cases if the comments and record do not demonstrate prejudice. *See Foster v. State*, 778 So. 2d 906, 917 (Fla. 2000) (trial judge's comment "Tell it to the supreme court[,] You'll get an opportunity, I believe" did not "show any bias on the part of the trial court"). While it may be that the trial court should not have mentioned this Court, in the context of this proceeding, the

- 34 -

statement does not constitute a well-founded fear of partiality. *See id.*; *Asay*, 769 So. 2d at 980-81; *Quince*, 592 So. 2d at 670.

Next, the purpose of the December 13, 2013, hearing was to determine if trial counsel should be removed. Wall was upset with counsel and irritated because the trial court did not find any grounds to remove counsel. Part of Wall's frustration was that he was not notified about an in camera hearing between his trial counsel and the trial court. Yet the purpose of the in camera hearing was to discuss the death threats that Wall made towards his own defense team. The comment that Wall takes issue with was stated as the trial court attempted to explain the balance of competing interests by holding an in camera hearing:

> I'm just telling you, I'm trying to balance competing interests here to get to the right decision. You can second-guess me. The Supreme Court will have every chance to second-guess me.

This all occurred after Wall attempted to pressure the trial court to force the State to accept his desired conditional plea for the death penalty in exchange for dismissing the charge regarding C.J.'s murder. Also during this proceeding, Wall reiterated that his goal was to receive the death penalty, and he wanted to get a death sentence as quickly as possible. Throughout the years that this case was in the pre-trial posture, the trial court attempted to move the case along; however, Wall's combative positions slowed the case despite any attempt by the trial court to explain that cooperation would move the case toward a resolution. Based on the

context and history of the case, Wall had no fear that the trial court was biased against him, and the motion to disqualify merely followed his six-year pattern of thinly veiled attempts to manipulate the proceedings. *See Parker*, 3 So. 3d at 982 (noting that the alleged facts must "cause the movant to have a well-founded fear"). In fact, Wall affirmatively sought the death penalty and his only fear, the subject of much consternation regarding the plea, was that he would *not* receive it. Thus, no objectively reasonable person—in Wall's position—would have a well-founded fear that the trial court was unduly biased or prejudiced. *See id.*

Accordingly, Wall's motion was properly denied as legally insufficient.

<u>Voluntariness of the Plea</u>

Although not addressed by Wall, this Court has an independent obligation to review pleas serving as the basis for first-degree murder convictions. *Doty v. State*, 170 So. 3d 731, 738-39 (Fla. 2015); *McCoy v. State*, 132 So. 3d 756, 765 (Fla. 2013). In doing so, the Court reviews the plea colloquy and record to ensure that the plea was "knowingly, intelligently, and voluntarily entered." *McCoy*, 132 So. 3d at 765-66. Here, we conclude that Wall knowingly, intelligently, and voluntarily entered his plea of guilty and no contest.

The trial court conducted a thorough plea colloquy, which mirrored those found sufficient in *Doty*, 170 So. 3d at 738-39, and *McCoy*, 132 So. 3d at 765-66. Wall understood that the only possible outcomes of his pleas would be either life

or death sentences. Wall understood that the trial court would weigh the aggravators and mitigators to determine if death was appropriate. The trial court detailed the constitutional rights that Wall forfeited as a result of his pleas. Further, the trial court specifically sought to determine that Wall was not being forced into the pleas or promised anything to induce the pleas. The State provided a factual basis of the crimes, with Wall noting those facts with which he disagreed, along with his decision not to dispute that basis. Finally, the trial court found that Wall was alert, intelligent, and voluntarily entering the pleas when the court accepted them.

Based on the plea colloquy and record, it is clear that Wall knowingly, intelligently, and voluntarily entered the pleas.

### Proportionality of Death Sentence

Although not raised by Wall, "this Court has an independent obligation to perform a proportionality review." *Salazar v. State*, 991 So. 2d 364, 379 (Fla. 2008). We conclude that the death sentences are proportionate.

The trial court found four aggravators as to each murder, and those findings were supported by competent, substantial evidence. The aggravators included prior violent felony, HAC, and CCP, which are "among the weightiest" aggravators in Florida's statutory scheme. *Jordan v. State*, 176 So. 3d 920, 936 (Fla. 2015); *Brown v. State*, 126 So. 3d 211, 219-20 (Fla. 2013). Those

aggravators were compared against one statutory mitigator as to Taft's murder—the capital felony was committed while Wall was under the influence of extreme mental or emotional disturbance (*moderate weight*)—and seven nonstatutory mitigators, which were relevant to both murders.[6]

We have upheld death sentences that were both less aggravated and more mitigated. *See, e.g.*, *King v. State*, 89 So. 3d 209, 231-32 (Fla. 2012) (proportionate sentence when four aggravators, including HAC and CCP, were compared with two statutory and thirteen nonstatutory mitigators); *Brant v. State*, 21 So. 3d 1276, 1284-88 (Fla. 2009) (proportionate sentence when two aggravators, including HAC, were compared with three statutory and ten nonstatutory mitigators); *Johnston v. State*, 863 So. 2d 271, 286 (Fla. 2003) (proportionate sentence when two aggravators, previous felony and HAC, were compared with one statutory and twenty-six nonstatutory mitigators); *Smithers v. State*, 826 So. 2d 916, 931 (Fla. 2002) (proportionate sentence when three

---

6. Those mitigators follow: (1) Wall attempted to create a familial lifestyle for his family—*very slight weight*; (2) Wall is capable of cultivating interpersonal relationships—*slight weight*; (3) Wall was abused by his mother and attempted to shield his siblings from her abuse—*slight weight*; (4) Wall suffers from a mental illness and received inconsistent mental health treatment form early childhood—*some weight*; (5) Wall suffered from significant childhood trauma and abuse—*some weight*; (6) Wall's prolonged institutionalization from a young age—*slight weight*; and (7) Wall's familial pattern of mental illness—*very slight weight*.

aggravators, previous felony, HAC, and CCP, were compared with two statutory and seven nonstatutory mitigators).

Of course, the "death penalty is reserved for the most aggravated and least mitigated murders to ensure its uniform application." *Jeffries v. State*, 222 So. 3d 538, 548 (Fla. 2017). The murders here fall squarely in line with those most aggravated and least mitigated; accordingly, death is proportionate.

Pro Se Brief

Despite our general prohibition on pro se filings in cases such as this, we granted Wall the opportunity to set forth his personal positions in a supplemental pro se brief. *See Davis v. State*, 789 So. 2d 978, 981 (Fla. 2001). This request was granted due to the unique nature of this case as fitting within an extremely limited exception to our general prohibition. *See id.* at 981 n.3; *see also Doty*, 170 So. 3d at 737. We have reviewed Wall's supplemental pro se brief, concluding that his claims are meritless and warrant no further discussion.

**CONCLUSION**

Accordingly, we affirm Wall's convictions and sentences of death.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, POLSTON, and LAWSON, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Pinellas County,
    Philip J. Federico, Judge - Case No. 522010CF003759XXXXNO

Howard L. "Rex" Dimmig, II, Public Defender, and Julius J. Ausilio, Assistant
Public Defender, Tenth Judicial Circuit, Bartow, Florida; and Craig Alan Wall, Sr.,
Pro Se, Raiford, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, Marilyn M. Beccue and
C. Suzanne Bechard, Assistant Attorneys General, Tampa, Florida,

    for Appellee