# Supreme Court of Florida

————

No. SC19-8

————

**MICHAEL LAWRENCE WOODBURY,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

April 15, 2021

PER CURIAM.

Michael Lawrence Woodbury appeals his conviction of first-degree murder and sentence of death. We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const.

## FACTS AND PROCEDURAL HISTORY

In March 2018, Woodbury was indicted on one count of first-degree murder for killing his cellmate, Antoneeze Haynes. At the time of the offense, Woodbury was serving life sentences for killing three people in New Hampshire during a 2007 robbery.

The evidence presented at trial showed that on September 22, 2017, Woodbury barricaded the door to the cell he shared with Haynes and then proceeded to brutally assault Haynes for hours, using his fists, boots, and makeshift weapons Woodbury had gathered in preparation for the attack. Woodbury appeared to delight in torturing Haynes, at one point telling the victim: "I know it hurts, I know. You deserved that one, you know you did. It's called torture. Welcome to the house of pain. Welcome to the house of pain. The house of pain actually exists. It's in the ninth level of hell. I used to run it." The assault lasted about four hours, and it involved what Woodbury admitted was a hostage situation, with Woodbury threatening to further harm Haynes if officers on the scene failed to meet Woodbury's demands. At one point, Woodbury instructed the correctional officers to take away medical equipment that had been brought in to treat the victim, saying: "You're probably going to need a body bag, but not medical equipment. You can take that stuff with you." Woodbury only stopped assaulting Haynes and surrendered when he realized a forcible extraction was imminent.

At his first appearance in court, Woodbury invoked his right to represent himself at trial, which prompted the court to conduct a *Faretta*[1] inquiry. Woodbury indicated that he understood every question asked and informed the court that he was taking medication for treatment of bipolar disorder. The next time Woodbury appeared in court, he remained adamant about wanting to represent himself at trial, and when the court explained the advantages of counsel and the disadvantages of self-representation, Woodbury said he understood. He expressed frustration when told to expect renewed offers of counsel and *Faretta* inquiries throughout the proceedings.

The court asked Woodbury about his history of bipolar disorder and Woodbury told the court that he had experienced "[m]ood swings, just stuff like that." The court also asked about the treatment Woodbury was undergoing for his disorder and asked if there were any physical issues that would impair Woodbury's ability to represent himself, and Woodbury said he had no other issues. The court granted Woodbury's request to proceed pro se, finding

---

1. *Faretta v. California*, 422 U.S. 806 (1975).

that Woodbury's waiver of counsel was made freely and voluntarily with a full understanding of his rights, and that Woodbury was competent to make that decision. With Woodbury's agreement, the court appointed standby counsel for Woodbury and told him that counsel would be appointed to represent him if, at any point in the proceedings, he ever decided that he wanted an attorney.

At a subsequent pretrial hearing, the trial court conducted another *Faretta* inquiry and again found Woodbury competent to waive counsel and that he had done so knowingly and intelligently. The State asked the court to conduct new *Faretta* inquiries each day of the trial to perfect the record. Woodbury objected to having to endure so many inquiries, saying he had read more than 105 cases and failure to conduct repeated *Faretta* inquiries was not a basis for appeal.

Woodbury's trial began on May 14, 2018. On the first day of trial, the court renewed the offer of counsel and conducted another lengthy *Faretta* inquiry. Woodbury maintained his decision to proceed pro se, explaining that he would want an attorney to handle his appeal if he were to be convicted but that he did not want counsel for the trial. Woodbury answered more questions

about his bipolar disorder and other issues that might affect his ability to proceed pro se. The court again found that Woodbury understood the charges against him and the consequences of waiving counsel, and found that he had voluntarily, knowingly, and intelligently waived his right to counsel.

During jury selection that same day, Woodbury conducted voir dire on the potential jurors and occasionally consulted with his standby counsel. The State asked for a finding on Woodbury's competence and demeanor, and the court said:

> I think you've done actually very well for somebody in your circumstance with what you're charged with, the seriousness of it . . . . I actually will compliment you on your behavior. It's a little more laid back than an attorney is going to do, there's no question about that, you know what I mean. But overall I think you've complied with the general courtroom demeanor that's necessary and I appreciate that for what it's worth.
>     . . . .
>
> . . . You'd be surprised, some people come here unrepresented and you can't figure what their focus is. Yours I think is pretty clear. So I'll leave the record at that and I think it's actually . . . quite impressive.

The following day, the court renewed the offer of counsel and Woodbury maintained his insistence on representing himself. The

trial court found that Woodbury was competent to waive his right to counsel and that he had done so knowingly and voluntarily.

In his opening statement to the jury, Woodbury claimed that the victim had tried to sexually assault him and that the assault and killing of the victim was in response to that attempted sexual assault. Woodbury admitted, however, that he "went berserk" and that he kicked the victim in the face "like a 50-yard field goal that would have been good from 60."

During the State's case-in-chief, law enforcement officers and prison staff provided gruesome details about Woodbury's four-hour assault on the victim. Correctional officers testified that they were unable to enter the cell because Woodbury had barricaded the door, but that they could see Woodbury through a window and could see another inmate lying face down on a bunk with blood "all over the place." The State introduced photographs of the victim's extensive injuries, and the medical examiner testified that by the time officers got into Woodbury's cell, the victim had died from severe blunt force trauma, and that he died experiencing a "great, great, great deal of suffering."

During a brief recess to discuss time to call defense witnesses, Woodbury told the court that he was planning to change his plea to guilty. He said, "I know, it's crazy, but that's what I'm doing tomorrow. I'll be changing my plea to guilty of first-degree murder tomorrow after I get done testifying." The next day of trial, the court renewed the offer of counsel and conducted a truncated *Faretta* inquiry. The court stated that a full inquiry was unnecessary because one had already been conducted during the same stage of the proceeding. The State called Major Frank Gatto, who testified that Woodbury was "very malicious . . . in his intent on what he was trying to do" and appeared "methodical" with his actions, which "seemed to be almost planned out, like he had a plan in mind." The State played a lengthy video recording filmed during Woodbury's assault on the victim, in which Woodbury could be heard assaulting, torturing, and tormenting the victim.

The next day of trial began with another renewed offer of counsel, and Woodbury said he understood the disadvantages of representing himself and rejected the offer. The trial court found that Woodbury was competent to waive counsel and had done so knowingly, voluntarily, and intelligently. When the State rested, the

court began yet another *Faretta* inquiry, but Woodbury objected, declaring: "I have a constitutional right to represent myself, and this has rose to the level of harassment."  The court replied:

> You know what.  For the record, I don't disagree.  I think the fact is you've understood this the multiple times I've done it.  That doing it again, if an appellate court were to think that it's a good idea to do this as often as we have, I think that I would disagree with them and you'd be in agreement with me.  However, the above trial level courts have a different way of viewing things.  They're not as worried about practicality as they are about structural integrity of the system.  So I'm going to go through them relatively quickly, you can answer them yes or no.  If at any point, though, you do have a question, please let me know.  So, again, I'm going to do it relatively quickly.

Woodbury asked the court: "[H]ow long do I got to answer?  We're going to play the game now. . . .  Do I got five minutes, ten minutes?  I might want to think about each question and consider it."  Woodbury insisted that his right to represent himself superseded the need for constant *Faretta* inquiries, and he threatened to stall the proceedings.  The court asked, "[A]m I right to conclude you are requesting the Court not to ask you these questions at this time?"  Woodbury stated that this was exactly what he was requesting and declared that in all the cases he had read, "every time they only did the *Faretta* hearing one time and that was enough."  Woodbury

acknowledged that a new *Faretta* inquiry would be required before moving to the penalty phase, and he said he would cooperate fully with that inquiry when the time came.  The court found that Woodbury validly requested to forgo a *Faretta* inquiry before the defense case-in-chief, and that Woodbury had knowingly and voluntarily waived counsel and was competent to do so.

During the defense case-in-chief, Woodbury briefly called two defense witnesses and then took the stand on his own behalf.  He testified that he woke up on the morning in question to find the victim attempting to sexually assault him.  Woodbury admitted he had a weapon at the ready but he claimed the victim's death was not premeditated, saying: "[I]f I was planning on killing my roommate before I went to bed, I would have at least put a point on my knife."  He also admitted to holding the victim hostage but claimed he only did so to stall for time until a tactical team with cameras arrived.  He insisted he did not wish to keep hurting the victim but that the victim kept sitting up, and so "every time he sat up, [Woodbury] refreshed him with the business."

After giving the jury his version of events, Woodbury declared in open court: "So in the eyes of the law, you know, what the

prosecution has charged me with is true. And at this time, I'd like to plead guilty to first-degree premeditated murder, your Honor. What you got?"

The trial court quickly excused the jury and then went through the plea form line-by-line, with Woodbury's input. The court conducted a colloquy on the voluntariness of Woodbury's plea, and Woodbury indicated that he understood that the death sentence was still a possibility. Before it accepted Woodbury's plea, the court renewed the offer of counsel, conducted another *Faretta* inquiry, and found that Woodbury was competent to waive his right to counsel. The court then complimented Woodbury again, stating:

> [Y]our ability to understand, you're obviously intelligent and you have been able to handle yourself in court, whether it's questioning or just behavior or being -- being able to ask your standby counsel. Even asking to do so, you've been polite, you've been courteous, and I think your behavior has been, compared to all the other pro se people in the past, actually better than all of them combined.

Woodbury told the court that his standby counsel had provided excellent assistance with all legal questions, and the trial court accepted Woodbury's guilty plea. Woodbury then asked to be permitted to represent himself at the penalty phase trial and said

he had consulted with standby counsel about that decision. The court ordered a presentencing investigation, and the State asked the court to appoint a mental health expert for potential mitigation. Three days later, the court appointed Dr. Joseph Sesta to conduct a mental health evaluation for mitigation.

Woodbury's penalty phase trial began on July 23, 2018. The proceeding began with another renewed offer of counsel and *Faretta* inquiry, and with the court taking judicial notice of Woodbury's previous statements about his bipolar disorder. Woodbury indicated that he understood the rights he was waiving and the disadvantages of self-representation, and the court granted his request to proceed pro se after finding him competent to waive his right to counsel.

Woodbury asked the court to read either of two special jury instructions Woodbury had prepared that would have informed the jurors that even if they found death to be justifiable, they could still recommend life in prison as an act of mercy. Following a recess and an abridged *Faretta* inquiry, the court rejected Woodbury's instructions. Woodbury did not object to the final instructions read.

The State presented penalty phase testimony from law enforcement officers and victims of Woodbury's prior crimes, introduced fingerprint evidence and a judgment from another case to show that Woodbury had prior convictions for robbery and three other murders, and presented evidence to show that Woodbury killed his cellmate while serving a sentence of imprisonment and that the killing was particularly heinous and cruel. The State also played portions of an interview given shortly after the murder, in which Woodbury made no mention of the victim attempting to sexually assault him but did describe how he had sharpened a piece of metal, taken a lock from his locker, waited until an inept correctional officer was on duty, put on and laced up his boots, and barricaded his cell door to prevent entry by responding officers. Woodbury testified on his own behalf. He admitted that his assault on the victim constituted torture, but he claimed that the victim had tried to rape him and that "it was getback time. . . . It was just getback, it was just vengeance, it was just wanting to hurt you for what you tried to do to me, for what you thought you could do. . . . That's really why I did what I did."

The court instructed the jury that in order to recommend the death penalty, it must unanimously find that at least one aggravating factor had been proven beyond a reasonable doubt. The court read instructions on the four aggravators alleged by the State: (1) Woodbury was previously convicted of a felony and under sentence of imprisonment; (2) he was previously convicted of another capital felony or a felony involving the use or threat of violence to another person; (3) the murder was especially heinous, atrocious, or cruel; and (4) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. The court then instructed the jury to consider mitigation, such as whether the crime was committed while Woodbury was under extreme mental or emotional disturbance or any other factors that mitigate against the death penalty. The jury unanimously recommended the death penalty after unanimously finding that the State had proved all four aggravators alleged and that the aggravators outweighed the mitigators and were sufficient to impose death.

A *Spencer*[2] hearing was held on September 21, 2018.  It began

with a *Faretta* inquiry that included asking Woodbury if he

understood that the State was in possession of mental health

mitigation evidence.  Woodbury said he understood all questions

asked.  The court asked Woodbury about his bipolar disorder and

treatment for it.  Woodbury said he began taking Tegretol shortly

after the murder, that he took it consistently during the trial, and

that it did not affect his ability to understand the proceedings.  The

court asked Woodbury if he had been diagnosed with any other

mental illnesses.  When he said no, the court replied: "You had

hesitation. It's fine with me if you answer it.  I mean, now–look, it's

for your benefit."  Woodbury said: "None that I believe."  The court

found that Woodbury knowingly and intelligently waived counsel

and was competent to do so.

Standby counsel testified at the hearing that Woodbury knew

there was a factual basis for mental health mitigation, including

opinions contained in the report written by Dr. Sesta, but that

Woodbury elected not to present any such mitigation.  When

---

2.  *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

- 14 -

pressed on that issue by Woodbury, standby counsel agreed with Woodbury that the decision was strategic in nature—that Woodbury already had a penalty phase strategy and never intended to present mental health mitigation. After Woodbury explained why he did not wish to present mental health mitigation on his own behalf, the State offered Dr. Sesta's report into evidence, and the court admitted the report for potential mitigation.

Woodbury was adjudicated guilty and sentenced to death. In the sentencing order, the court found that all four aggravators alleged by the State had been proved and assigned great weight to each aggravator. The court then examined whether the murder was committed while Woodbury was under the influence of extreme mental or emotional disturbance. The court found that although there was no *competent* evidence to support that mitigator, it could not say there was no evidence whatsoever in the record, and so assigned the mitigator minimal weight. The court then examined whether Woodbury's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law was substantially impaired, finding that this mitigator was never raised

and that any applicability would be covered by the findings on mental or emotional disturbance.

The court also found that although the facts cast doubt on Woodbury's version of the incident, there was at least *some* mitigation on that issue in the record, but only worthy of minimal weight. In addition, the court found that although Woodbury did not present any mental health mitigation on his own behalf, there was mental health mitigation in the record because Dr. Sesta's report mentioned bipolar disorder and schizophrenia. The court assigned little weight to Woodbury's diagnosis and history of bipolar disorder and assigned minimal weight to Dr. Sesta's mention of schizophrenia. After making findings on each aggravator and mitigator, the court sentenced Woodbury to death.

## ANALYSIS

In this direct appeal of the judgment of conviction and sentence of death, Woodbury argues that the trial court erred by: (1) granting Woodbury's waiver of counsel and request to proceed pro se without first ordering a mental health evaluation; (2) failing to sua sponte order a competency hearing to determine if Woodbury was competent to stand trial; (3) accepting a guilty plea that was

not entered intelligently and voluntarily and had no factual basis; (4) failing to renew the offer of counsel at the start of the defense case-in-chief and when Woodbury announced his change of plea; (5) accepting Woodbury's waiver of mental health mitigation without appointing special counsel to present mitigation evidence; (6) finding that the murder was committed in a cold, calculated, and premeditated manner, and instructing the jury on that aggravator; (7) admitting a noncomprehensive presentence investigation report that contained impermissible sentencing recommendations; (8) assigning minimal weight to the mitigator of extreme mental or emotional disturbance; (9) rejecting a requested special jury instruction on mercy; and (10) failing to instruct the jury that it must find *beyond a reasonable doubt* that the aggravators outweighed the mitigators and were sufficient for the death penalty.[3] We address each claim in turn, and for the reasons set forth below, we affirm Woodbury's conviction and sentence of death.

---

3. Woodbury also asserts that the court's failure to consider mitigators precludes us from conducting proportionality review. In light of our recent decision in *Lawrence v. State*, 308 So. 3d 544 (Fla. 2020), we need not address this claim.

### 1. Competency to Stand Trial and the Right to Self-Representation

Woodbury insists that the record shows that the trial court knew of Woodbury's history of bipolar disorder and observed instances of erratic behavior from Woodbury in court. Thus, Woodbury argues that the trial court knew he suffered from a severe mental illness to the point of being incompetent to conduct the proceedings without assistance and should therefore have denied his request to proceed pro se at trial. Even more fundamentally, Woodbury argues that his bipolar disorder diagnosis and erratic behavior gave the trial court reasonable ground to believe Woodbury was not mentally competent to stand trial, and that the court should therefore have ordered a competency hearing before proceeding.

*A. Whether a Competency Hearing was Required*

An accused has a right to adequate process to ensure he is not tried or sentenced while mentally incompetent to stand trial. *Pate v. Robinson,* 383 U.S. 375, 378 (1966). Florida Rule of Criminal Procedure 3.210(b) provides:

> If, at any material stage of a criminal proceeding, the
> court of its own motion, or on motion of counsel for the

- 18 -

> defendant or for the state, has reasonable ground to
> believe that the defendant is not mentally competent to
> proceed, the court shall immediately enter its order
> setting a time for a hearing to determine the defendant's
> mental condition . . . .

When a defendant claims a trial court failed to order a competency hearing, either sua sponte or on request from a party, we will uphold the court's determination absent an abuse of discretion. *Rodgers v. State*, 3 So. 3d 1127, 1132 (Fla. 2009).

Woodbury argues that his admission of bipolar disorder gave the court reasonable ground to believe he was not mentally competent, but "[n]ot every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges." *Barnes v. State*, 124 So. 3d 904, 913 (Fla. 2013) (defendant's disclosure of mental illness did not require the trial court to order a competency hearing because nothing about the defendant's behavior during the proceedings created grounds to believe he was incompetent) (quoting *Card v. Singletary*, 981 F.2d 481, 487-88 (11th Cir. 1992)); *see also Nelson v. State*, 43 So. 3d 20, 29 (Fla. 2010) (defendant's suicide attempt and treatment with

antipsychotic medication did not raise doubts about his competency to stand trial).

Like the defendant in *Barnes*, Woodbury disclosed a history and diagnosis of bipolar disorder, but nothing about his behavior in court indicated a present inability to understand the proceedings against him or an inability to consult with his standby counsel (or with counsel, had an attorney been appointed). Woodbury filed motions on his own behalf, was consistently alert, demonstrated knowledge of legal issues, behaved appropriately, and stated multiple times that he understood the proceedings. At no time did the trial court, Woodbury's standby counsel, or the attorneys for the State express any concerns about Woodbury's competency. Rather, the trial court outright *praised* Woodbury more than once for his ability to conduct himself appropriately and properly engage with the court, jury, and standby counsel. The court went so far as to call Woodbury's behavior better than all other pro se defendants the court had seen, combined.

Woodbury invokes *Drope v. Missouri*, 420 U.S. 162, 179 (1975), where the Supreme Court held that a trial court ignored details that raised doubts about the defendant's competency. But

- 20 -

the defendant in *Drope* did not merely disclose a history of mental illness and demonstrate attention problems; he attempted suicide during the trial. *Id.* at 180. That suicide attempt *plus* uncontested testimony about the defendant's wildly irrational recent behavior—including trying to choke his wife to death just before trial—created sufficient grounds to doubt the defendant's competency to stand trial. *Id.*

Here, by contrast, Woodbury did nothing so extreme as attempting suicide during the trial, and the trial court was given no evidence of wildly irrational recent behavior.[4] Woodbury points to moments from trial that supposedly show erratic and irrational behavior, but at most, the cited conduct suggests attention span problems or overconfidence; nothing put the court on notice that Woodbury had a present inability to understand the proceedings or to consult with counsel.[5]

---

4. Certainly, Woodbury's behavior during the assault of the victim could be described as irrational, but that was not as recent as the pretrial behavior in *Drope,* and the court here conducted in-depth inquiries into the mental health treatment and medication Woodbury had received following the murder.

5. Woodbury further argues that the side effects of his medication created reasonable ground to doubt his competency to

Likewise, although Dr. Sesta's psychological report, which was entered for potential mitigation, described Woodbury as having a fluctuating attention span, the report never suggested that Woodbury's behavior during the examination indicated an inability to understand the charges or consult with counsel. Thus, even though the trial court knew that Woodbury had been diagnosed with (and treated for) bipolar disorder, nothing about his behavior in court, and nothing presented to the trial court, created a reasonable ground to believe Woodbury was not mentally competent to stand trial. Accordingly, the trial court was not required to sua sponte order a competency hearing.

### B. Whether the Court Erred in Granting Woodbury's Request to Represent Himself at Trial

Woodbury argues that even if he was competent to stand trial, the trial court knew he had a severe mental illness that rendered him incompetent to represent himself, and that the trial court therefore erred in granting his request to proceed pro se. Trial

---

stand trial. But the side effects he said he had experienced were sleepiness, nervousness, blurry vision, and trouble urinating. Woodbury points to no authority declaring that these side effects create grounds to doubt one's ability to understand the trial proceedings or assist counsel.

court rulings regarding competency to waive counsel are reviewed for abuse of discretion. *Trease v. State*, 41 So. 3d 119, 124 (Fla. 2010).

An accused has a Sixth Amendment right to represent himself at trial. *Tennis v. State*, 997 So. 2d 375, 377 (Fla. 2008). And while an accused also has a right to the assistance of counsel, that right confers just what it says—assistance. "To thrust counsel upon the accused, against his considered wish . . . violates the logic of the [Sixth] Amendment. In such a case, counsel is not an assistant, but a master . . . ." *Faretta*, 422 U.S. at 820. Therefore, each defendant "must be free personally to decide whether in his particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.'" *Id.* at 834 (quoting *Illinois v. Allen*, 397 U.S. 337, 350-51 (1970) (Brennan, J., concurring)).

Given the constitutional right to self-representation, "once an unequivocal request for self-representation is made, the trial court is obligated to hold a hearing, to determine whether the defendant is knowingly and intelligently waiving his right to court-appointed

counsel." *Tennis*, 997 So. 2d at 378. The purpose of this inquiry (often called a *Faretta* inquiry) is not to assess whether the defendant possesses a degree of technical skill at trial advocacy, but whether his waiver of counsel is knowing and intelligent. *McKenzie v. State*, 29 So. 3d 272, 281 (Fla. 2010); *see also Faretta*, 422 U.S. at 835 ("Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation . . . .").

That said, while technical skill is not part of the *Faretta* calculus, "the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer." *Indiana v. Edwards*, 554 U.S. 164, 177 (2008) (quoting *Martinez v. Court of Appeal*, 528 U.S. 152, 162 (2000)). Thus, after conducting a *Faretta* inquiry, a trial court may preclude a defendant from exercising his right to proceed pro se if the court finds that the defendant is "unable to carry out the basic

tasks needed to present his own defense without the help of counsel." *Id.* at 175-76.[6]

In Florida, Rule of Criminal Procedure 3.111(d)(3) addresses the right to self-representation. It accounts for the aforementioned bases by which a court may lawfully force counsel on an unwilling defendant, stating:

> Regardless of the defendant's legal skills or the complexity of the case, the court shall not deny a defendant's unequivocal request to represent himself or herself, if the court makes a determination of record that the defendant has made a knowing and intelligent waiver of the right to counsel, and does not suffer from severe mental illness to the point where the defendant is not competent to conduct trial proceedings by himself or herself.

Fla. R. Crim P. 3.111(d)(3). Thus, a Florida trial court may deny a defendant's request to proceed pro se if: (1) the defendant's waiver of his right to counsel was not made knowingly and intelligently; or (2) the defendant suffers from severe mental illness to the point of being incompetent to conduct trial proceedings without assistance.

---

6. In *Edwards*, the Supreme Court did not define these "basic tasks," but it did cite a case declaring that basic trial tasks included "organization of defense, making motions, arguing points of law, participating in voir dire, questioning witnesses, and addressing the court and jury." *Edwards*, 554 U.S. at 176 (citing *McKaskle v. Wiggins*, 465 U.S. 168, 174 (1984)).

The competency standard to waive one's right to counsel is the same as the competency standard to stand trial, whereas the competency standard to conduct trial proceedings without assistance is somewhat higher. *See Wall v. State*, 238 So. 3d 127, 140 (Fla. 2018) ("[D]efendants may be competent to waive counsel yet incompetent to represent themselves.").

Here, starting from his first appearance, Woodbury never wavered in his insistence on representing himself at trial. As it was required to do upon receiving an unequivocal request for self-representation, the trial court explained the benefits of counsel and the pitfalls of self-representation and conducted a full *Faretta* inquiry. The court renewed the offer of counsel and conducted additional *Faretta* inquiries approximately a dozen times over the course of the proceedings.[7] At the conclusion of each inquiry, the court found that Woodbury's rejection of the offer of counsel was

---

7. We do not suggest that all of these offers and *Faretta* inquiries were legally required. The record indicates that the trial court conducted so many inquiries to ensure that the offer of counsel was renewed at all critical stages of the proceedings. Nothing in the record suggests that any of the inquiries were prompted by new concerns about Woodbury's behavior or competency.

- 26 -

knowing and intelligent and that Woodbury was competent to make his decision. We agree. Woodbury responded appropriately to the court's questions and indicated that he understood both the proceedings against him and the rights he was giving up by proceeding pro se.

That leaves the question whether Woodbury's behavior in court, together with his bipolar disorder diagnosis, required the trial court to find that Woodbury suffered from severe mental illness to the point of being incompetent to conduct the proceedings by himself. To that end, Woodbury filed pro se discovery motions and a demand for speedy trial, conducted voir dire examination of the potential jurors by himself, cross-examined witnesses, argued evidentiary objections, and even requested a special jury instruction derived from the federal standard instructions. In fact, the record reveals several instances where Woodbury's pro se representation could easily be mistaken for the work of a veteran trial attorney.

Take for example this excerpt from voir dire of Woodbury questioning a potential juror's ability to set aside biases and consider mitigation:

MR. WOODBURY: Sir, just three minutes ago you said you have a very biblical view of the Bible, that it should be an eye for an eye, a tooth for a tooth, a life for a life. With respect to what he just said, do you still feel like that now?

PROSPECTIVE JUROR: I have to say yes, but you still have to take each situation, you know, you have to take each case, case by case.

MR. WOODBURY: So would -- so I am to understand that you can look past the Bible and obey Florida law and give consideration to mitigators such as self-defense, a bad childhood, level of involvement, all the mitigators that may be out there, you can give due consideration even though now the Florida law has trumped your Bible law, you're not going to have a problem with that?

PROSPECTIVE JUROR: No. I can – that's tough.

Thus, Woodbury's behavior in court defeats any claim that he was not competent to conduct the proceedings on his own. And Woodbury cites no authority—and we are aware of none—where a bipolar disorder diagnosis, without more, established that a defendant suffered from severe mental illness to the point of being incompetent to conduct trial proceedings without assistance. Woodbury's own arguments on appeal describe bipolar disorder as a broad spectrum of mental conditions, with varying degrees of symptoms and severity, including "hypomania," which Woodbury

describes as a less severe form of mania in which individuals are able to function well in social situations or at work and can retain the ability to act rationally on subjects beyond the sphere of the controlling delusion. Given that certain people with bipolar disorder function well and act rationally, we see no logic in creating a per se rule or presumption that all individuals with bipolar disorder suffer so severely from mental illness that they are unable to carry out basic trial tasks without assistance.

Woodbury points out that some individuals with bipolar disorder exhibit "confusion and poor judgment" and "potential disordered thinking," but these are only *possible* symptoms of bipolar disorder. When asked how bipolar disorder affected him personally, Woodbury told the trial court that prior to taking Tegretol (which he claimed was very effective at treating his symptoms), he experienced "[m]ood swings, just stuff like that." Mood swings, without more, do not indicate that a defendant is suffering from a severe mental illness to the point of incompetency. Accordingly, on this record, knowledge of Woodbury's bipolar disorder did not require the court to go beyond a *Faretta* inquiry before granting Woodbury's request to proceed pro se.

Woodbury argues that in addition to his history of bipolar disorder, his erratic courtroom behavior created reasonable ground to doubt his competence. Woodbury points out that he: (1) filed a demand for speedy trial before receiving any discovery; (2) announced he was ready to start trial just a month after being arrested; (3) indicated that he was unconcerned about the guilt phase; (4) compared the likelihood of a death penalty recommendation to getting struck by lightning; (5) said his prison outfit and handcuffs made for "excellent" courtroom attire; (6) told the jury he had chosen to represent himself because it was simple; (7) admitted his guilt during his guilt phase testimony; and (8) goaded the jurors by telling them to sentence him to death if it would make them feel better.

Even without any context, most of these purportedly erratic moments merely suggest a lack of technical skill. They can be considered "irrational" only insofar as they imply a nonchalant attitude from Woodbury about being found guilty. But Woodbury was already serving life sentences for three prior murders; the only way this trial could have affected him in any meaningful sense was in the penalty phase. In fact, Woodbury told the court that he

expected to be found guilty and that his focus was on sentencing. Thus, the cited behavior suggesting a blasé attitude toward a guilty verdict did not create grounds to doubt his competence.

As to the "lightning strike" comment, although Woodbury's appellate counsel frames this remark as a manic rant showing that Woodbury believed he was more likely to get struck by lightning than get the death penalty, Woodbury was not raving about the likelihood of weather phenomena. He was explaining to the court that while he was confident a jury would recommend a life sentence, he wanted a guilt phase trial "in case lightning strikes and somehow you find 12 people to agree and I get the death penalty, I want appeal issues for the guilt phase." If this comment demonstrates anything, it is not that Woodbury had erratic outbursts in court; it is that he was cognizant of the fact that a death penalty recommendation was possible notwithstanding his confidence in his penalty phase case, and that an appellate record would be helpful should he need to appeal.

Woodbury further argues that Dr. Sesta's psychological report created doubts about Woodbury's competence to proceed pro se. In that report, Dr. Sesta opined that Woodbury was experiencing an

active manic episode during the examination, had a fluctuating attention span, made some inappropriate comments, and was undermedicated. But Woodbury points to no case where inattentiveness or overenthusiasm rendered a defendant incompetent to represent himself at trial.

In sum, nothing in the record shows that the court abused its discretion by finding that Woodbury knowingly and intelligently rejected the court's offer of counsel, or that the court was required to find that Woodbury suffered from severe mental illness to the point of incompetency. Thus, the trial court did not err in allowing Woodbury to invoke his constitutional right to conduct his own defense.

## 2. **Woodbury's Guilty Plea**

Woodbury argues that the trial court erred in accepting his guilty plea. He insists that his decision to change his plea to guilty in open court, in front of the jury, gave the trial court reasonable ground to believe he was not mentally competent to enter the plea. Woodbury further argues that the trial court erred in finding that there was a factual basis for the plea. We find no error on either basis.

*A. Whether the Court Erred in Finding Woodbury Competent to Plead Guilty*

The competency standard to plead guilty is the same as the competency standard to stand trial, *Wall*, 238 So. 3d at 140, and so, "[d]uring 'any material stage' of a criminal proceeding, a defendant must immediately be examined for competence if the trial court 'has reasonable ground to believe that the defendant is not mentally competent to proceed.' " *Id.* (quoting Fla. R. Crim. P. 3.210(b)). "If that sufficient basis exists, the trial court 'shall immediately enter its order setting a time for a [competency] hearing . . . and may order the defendant to be examined by no more than 3 experts, as needed, prior to the date of the hearing.' " *Id.* (modifications in original) (quoting Fla. R. Crim. P. 3.210(b)). "Due process requires a court accepting a guilty plea to carefully inquire into the defendant's understanding of the plea, so that the record contains an affirmative showing that the plea was intelligent and voluntary." *Sanchez-Torres v. State*, 130 So. 3d 661, 668 (Fla. 2013) (quoting *Koenig v. State*, 597 So. 2d 256, 258 (Fla. 1992)).

Woodbury points out that when he initially told the court that he was planning to change his plea to guilty, he himself called the

decision "crazy." But while the decision to change one's plea in open court may be unorthodox, and while Woodbury may have believed at the time that he was doing something crazy, he points to no authority declaring that announcing a change of plea in front of a jury creates reasonable ground to believe the defendant is not mentally competent.

In any event, the trial court did not simply accept Woodbury's plea without question. It went through a colloquy with Woodbury to determine if his plea was being entered intelligently and voluntarily, and it explained to Woodbury that first-degree murder has only two possible sentences: life in prison and the death penalty. The court also told Woodbury that the plea form would indicate that there was no agreement for his open plea, meaning Woodbury could still be sentenced to death. Woodbury said he understood. The court then went through the plea form line-by-line with Woodbury to make sure he understood what he was doing, and at no time did Woodbury say anything that suggested he did not understand the plea or the consequences of pleading guilty.[8]

---

8. The State argues that Woodbury's decision to change his plea in open court was an attempt to game the system by

On this record, we find no error in finding Woodbury competent to enter a guilty plea.

*B. Whether There Was a Factual Basis for the Plea*

Woodbury argues that the trial court erred in finding that there was a factual basis for his guilty plea. "[I]n order to challenge a guilty plea for lack of a factual basis determination by the trial judge, a defendant must show prejudice or manifest injustice." *State v. Kendrick*, 336 So. 2d 353, 355 (Fla. 1976). The inquiry to determine if a plea has a factual basis "need not be a 'mini-trial' "; a court may be satisfied from "statements and admissions made by the defendant, or by his counsel, or by the prosecutor." *Farr v. State*, 124 So. 3d 766, 778 (Fla. 2012) (quoting *Monroe v. State*, 318 So. 2d 571, 573 (Fla. 4th DCA 1975)); *see also Santiago-Gonzalez v.*

---

presenting a sympathetic explanation for his actions and then avoid a damning cross-examination that would have impeached him with prior inconsistent statements and convictions for felonies and crimes of dishonesty. It is true that Woodbury objected when told he might still be cross-examined, and that he said his plea change was "110 percent my idea to spin a circle around you like I said I was going to." But it matters not why Woodbury chose to change his plea the way he did; what matters is that his actions did not establish reasonable grounds to believe his plea was not being entered voluntarily and intelligently. *See Brant v. State*, 21 So. 3d 1276 (Fla. 2009).

*State*, 301 So. 3d 157, 180 (Fla. 2020) ("The State provided a factual basis for the murder, to which the defense conceded for the purpose of the guilty plea."). However, when the defendant raises the possibility of a defense to his guilty plea during the plea colloquy, "the potential prejudice is apparent" and so the trial judge "should make *extensive* inquiry into factual basis before accepting the guilty plea." *Kendrick*, 336 So. 2d at 355.

Here, the trial court did not err in finding a factual basis for Woodbury's guilty plea to premeditated first-degree murder. During the trial, law enforcement and correctional officers who responded to the incident described Woodbury's assault on the victim as "methodical" and planned out. And video played at trial showed that Woodbury had weapons on hand and that he brutally attacked the victim several times *after* the victim had been completely incapacitated.

Woodbury also said nothing during the plea colloquy suggesting a defense to premeditated murder. Although he testified on the stand that he had no intent to kill the victim when he went to bed *the night before*, this does not establish a defense to the charged offense such that an extensive inquiry into factual basis

was required, for "[p]remeditation can be formed in a moment and need only exist 'for such time as will allow the accused to be conscious of the nature of the act he is about to commit and the probable result of that act.' " *DeAngelo v. State*, 616 So. 2d 440, 441 (Fla. 1993) (quoting *Asay v. State*, 580 So. 2d 610, 612 (Fla. 1991)).

Because the guilty plea to premeditated first-degree murder in this case was entered intelligently and voluntarily and there was a factual basis for the plea, we affirm the trial court's acceptance of Woodbury's plea.

### 3. **Renewed Offer of Counsel**

Woodbury's next claim is that the court failed to renew the offer of counsel at all critical stages of the proceedings. Specifically, Woodbury argues that the trial court was required to, but did not, offer counsel at the start of the defense case-in-chief and at the time Woodbury announced his change of plea.

Florida Rule of Criminal Procedure 3.111(d)(5) provides that if a waiver of counsel is accepted at any stage of the proceedings, "the offer of assistance of counsel shall be renewed by the court at each subsequent stage of the proceedings at which the defendant

appears without counsel." This rule does not require a renewed offer of counsel each time the defendant appears in court; rather, a court must renew the offer of counsel at "critical" stages of the proceedings. *Knight v. State*, 770 So. 2d 663, 670 n.6 (Fla. 2000); *see Muehleman v. State*, 3 So. 3d 1149, 1156 (Fla. 2009) ("[T]he waiver applies only to the present stage and must be renewed at each subsequent crucial stage where the defendant is unrepresented." (quoting *Traylor v. State*, 596 So. 2d 957, 968 (Fla. 1992)).

Woodbury points to no case holding that the transition from the State's case-in-chief to the defense's case-in-chief marks a new critical stage of the proceedings such as to require a new offer of counsel and new *Faretta* inquiry. To the contrary, in *Knight*, we held that a renewed offer of counsel was not required "during the same stage of the proceeding where Knight waived his right to counsel, the trial portion." *Knight*, 770 So. 2d at 669.

As to whether a new offer of counsel was required at the time Woodbury announced his change of plea, there was no intervening stage of the proceeding that separated the court's previous *Faretta* inquiry from Woodbury's announcement of his change of plea. *See*

*id.* at 669-70 (holding that a *Faretta* inquiry conducted at a pretrial hearing satisfied the requirement to offer counsel at the start of trial because the pretrial hearing was held to discuss the upcoming trial and there were no intervening proceedings). On the previous day of trial, Woodbury told the court that he intended to change his plea to guilty when he finished testifying, and the court held a *Faretta* inquiry at the start of the next day of trial. The court also conducted a full *Faretta* inquiry and made a renewed offer of counsel before *accepting* Woodbury's plea. These inquiries and offers of counsel were sufficient to satisfy the obligations imposed by rule 3.111(d)(5).

### 4. **Aggravating and Mitigating Circumstances**

Woodbury makes a series of claims related to the trial court's findings on the statutory aggravators alleged by the State, and on certain statutory and nonstatutory mitigators. Woodbury argues that the trial court erred by allowing him to waive his right to mental health mitigation, by failing to consider mental illness mitigation that was in the record, and by not appointing special counsel to argue mitigation. Woodbury further argues that the trial court erred in assessing the "extreme mental or emotional

disturbance" statutory mitigator. Finally, Woodbury asserts that the court erred in instructing the jury on the "cold, calculated, and premeditated" aggravator and in finding its existence.

*A. Mental Health Mitigation*

A competent defendant may waive his right to present mitigating evidence in the penalty phase of his first-degree murder trial. *Spann v. State*, 857 So. 2d 845, 854 (Fla. 2003). We review for abuse of discretion a trial court's determination on a defendant's competence to waive mitigation. *Id.*

When a defendant does not challenge the imposition of the death penalty and refuses to present mitigation evidence on his own behalf, the trial court has an obligation "to require the preparation of a meaningful, comprehensive presentence investigation report (PSI)." *Marquardt v. State*, 156 So. 3d 464, 491 (Fla. 2015). In such circumstances, the trial court should require the State to place into the record all evidence of a mitigating nature that the State has in its possession. *Id.* Then, "[i]f the PSI and the accompanying records alert the trial court to the probability of significant mitigation, the trial court has the discretion either to call its own

witnesses or . . . appoint an independent, special counsel, who can call witnesses to present mitigation evidence." *Id.*

Woodbury argues that the trial court erred in this case when it let Woodbury waive his right to present mental health mitigation. Woodbury insists that "severe mental illness prevented him from entering a knowing, voluntarily [sic], and intelligent waiver" of his right to present mitigation. Woodbury also argues that a report discussing his mental health revealed an aspect of his character that mitigated against imposition of the death penalty, and that notwithstanding his waiver of mental health mitigation, the trial court should have considered the information in that report and should have appointed special counsel to argue the evidence.

As to whether Woodbury was competent to waive his right to present mitigating evidence, the trial court conducted a *Faretta* inquiry at the start of the penalty phase, advised Woodbury about the aggravators being alleged by the State, went over possible mitigating circumstances with Woodbury, and explained to Woodbury his right to present mental health mitigation. Woodbury's history of bipolar disorder did not in itself create a reasonable ground for the court to believe Woodbury was not

competent to waive his right to present mitigation, and Woodbury's responses to the court's inquiries created no such ground.

Moreover, the record demonstrates that Woodbury's waiver of mental health mitigation was not a product of mania, but of strategy. Woodbury told the court that his penalty phase strategy was to emphasize his alleged sexual assault by the victim, and he said, "I don't want to really mess that up with oh, he was a bad kid." And Woodbury's standby counsel testified that he and Woodbury discussed how Woodbury might avoid a mental health evaluation by the State and that Woodbury chose not to present mental health mitigation. Under these circumstances, we find that the trial court had no reasonable ground to doubt Woodbury's competency to waive his right to present mental health mitigation, and we therefore find no abuse of discretion in allowing the waiver.

As to whether the court failed to consider mitigating evidence in the record, particularly information mentioned in Dr. Sesta's psychological report, we note that the trial court properly ordered a PSI report after Woodbury waived his right to present mitigation. The State then introduced Dr. Sesta's report as potential mitigation. Later, in its sentencing order, the court found that "Dr. Sesta

diagnosed [Woodbury] with bi-polar disorder and some degree of Schizophrenia." And ultimately, the court found: "[T]here is proof in the record that [Woodbury] has been diagnosed with and is medicated for [bipolar] disorder. The Court will find that the mitigation is reasonably established and will assign little weight to the mitigation." Given that the trial court found the existence of mental health mitigation in the record and assigned it weight, at least in part based on information in Dr. Sesta's report, and given the weighty aggravation and minimal mitigation in this case, any error in the trial court's characterization or assessment of aspects of Dr. Sesta's report was harmless beyond a reasonable doubt.[9]

To the extent Woodbury is asserting that the trial court should have given more *weight* to the mental health mitigation, Woodbury has not demonstrated that the trial court abused its discretion in determining the degree of weight to assign to this mitigator. *See Covington v. State*, 228 So. 3d 49, 66 (Fla. 2017) (finding no abuse

---

9. We also find no merit in Woodbury's claim that the trial court was required to appoint special counsel to argue mitigation on Woodbury's behalf. *See Lockhart v. State*, 655 So. 2d 69, 74 (Fla. 1995).

of discretion in the trial court affording moderate weight to a mitigator, given the court's findings on that mitigator).

Moreover, "HAC, CCP, and prior violent felony are three of the weightiest aggravating circumstances." *Damas v. State*, 260 So. 3d 200, 216 (Fla. 2018). Given that all those aggravators (and more) were found in this case and assigned great weight, there is no reasonable possibility that affording too little weight to mental health mitigation affected Woodbury's sentence. *See, e.g., Tanzi v. State*, 964 So. 2d 106, 119-20 (Fla. 2007) ("[T]he trial court [made] a finding that is contrary to this Court's precedent. However, any error present was harmless beyond a reasonable doubt in light of the following: (a) the trial court recognized and gave weight to numerous other mitigating circumstances; (b) this case involves substantial aggravation, including the HAC and CCP aggravating circumstances; and (c) the . . . proposed mitigator is minor and tangential with respect to the record in this case.").[10]

---

10. Woodbury also asserts a procedural defect, insisting that after the *Spencer* hearing, the trial court should have ordered a recess and convened a separate proceeding for imposition of the sentence. However, Woodbury himself expressly objected to the court delaying the pronouncement of sentence and told the court to proceed directly to sentencing. Thus, the asserted error was

*B. Extreme Mental or Emotional Disturbance Mitigation*

Section 921.141(7), Florida Statutes (2017) lists the statutory mitigators that, if applicable, can weigh against imposition of the death penalty. One such statutory mitigator is when the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance. *See* § 921.141(7)(b), Fla. Stat. (2017). Another statutory mitigator—addressed in a separate subsection—is when the defendant's capacity to appreciate the criminality of his conduct, or to conform his conduct to the requirements of law, was substantially impaired. § 921.141(7)(f), Fla. Stat. (2017). Woodbury argues that the trial court conflated the tests for these two distinct mitigators when it assessed whether Woodbury was under the effect of mental or emotional disturbance.

It does appear from the sentencing order that the court applied the wrong test for determining the existence of the extreme mental or emotional disturbance mitigator. Specifically, when evaluating in the sentencing order whether Woodbury was under

_____

invited, and Woodbury may not be heard to complain of it on appeal. *See Lowe v. State*, 259 So. 3d 23, 53 (Fla. 2018). And even if we were to consider this claim, Woodbury has not shown that the asserted procedural defect rose to the level of fundamental error.

- 45 -

extreme mental or emotional disturbance, the trial court stated that "[t]here is no evidence that [Woodbury]'s emotional state was anywhere close to the level of obviating his knowledge of right and wrong." But while the degree to which a defendant knows right from wrong is relevant to assess whether the section 921.141(7)(f) mitigator applies (i.e., that defendant's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was substantially impaired), *see Duncan v. State*, 619 So. 2d 279, 283 (Fla. 1993), the section 921.141(7)(b) mitigator (i.e., that the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance) does not speak to a defendant's knowledge of right and wrong.

Nonetheless, the court ultimately assigned weight to the mitigator, remarking that "the Court cannot say there is no evidence of emotional disturbance." Thus, Woodbury cannot complain that the court's incorrect method of analysis resulted in a viable mitigator going unconsidered. Because the mitigator was considered, even if the path to get there was incorrect, and because extremely weighty aggravators were proved in this case, there is no

reasonable possibility that Woodbury would have received a different sentence had the trial court engaged in the proper analysis or had given more weight to the mitigator. *See Covington*, 228 So. 3d at 66. Accordingly, we find no reversible error as to the extreme mental or emotional disturbance mitigator.

*C. Cold, Calculated, and Premeditated Aggravation*

Woodbury next argues that the trial court erred in instructing the jury on the cold, calculated, and premeditated (CCP) aggravating factor and erred in finding the existence of the aggravator. We disagree.

Competent and substantial evidence from the penalty phase supports the trial court's instruction to the jury and its finding as to the CCP aggravator. Although Woodbury had told the jury that the victim attempted to rape him, Woodbury's testimony on the stand during the sentencing phase trial described the killing as an act of retribution, not self-defense. Woodbury said that the murder of his cellmate "was just getback [sic], it was just vengeance, it was just wanting to hurt you for what you tried to do to me, for what you thought you could do." This evidence supports the conclusion that Woodbury had no moral or legal justification for his actions. *See*

*Williamson v. State*, 511 So. 2d 289, 293 (Fla. 1987) (affirming a finding of CCP where the defendant's explanation that the victim posed a danger to others was not held to be a pretense of moral justification).

The penalty phase jury was also informed that Woodbury had admitted to procuring in advance the lock that he later used to beat the victim to death, to sharpening a blade prior to the murder, to waiting until a correctional officer whom Woodbury viewed as particularly inept came on duty, and to barricading his cell door to prevent officers from entering the cell during the assault. All this evidence, taken together, supports a conclusion that Woodbury made calculated and highly premeditated plans to carry out the killing of his victim.

Moreover, the jury watched a video played during the penalty phase, in which Woodbury said that he "was so happy to kill someone again" and that he "enjoyed torturing" the victim. *Cf. Pham v. State*, 70 So. 3d 485, 498 (Fla. 2011) (affirming a CCP finding where the defendant had obtained the murder weapon to commit the killing and then committed the murder as "a matter of course").

Because evidence introduced during the penalty phase supports each aspect of the proof required for the CCP statutory aggravator, we find no error in the trial court finding the existence of the CCP aggravator or instructing the jury on the aggravator.[11]

## 5. **Presentence Investigation Report**

Woodbury's next claim is that the trial court erred in admitting a presentence investigation report that allegedly violated the requirements of Florida Rule of Criminal Procedure 3.710. Because Woodbury never brought any concerns with the report to the trial court's attention, this claim is reviewed for fundamental error.

Rule 3.710(b) provides that when a criminal defendant refuses to present mitigation evidence, the trial court shall refer the case to the Department of Corrections for the preparation of a presentence

---

11. Because Woodbury failed to preserve his claim that the trial court erred in instructing the jury on the CCP aggravator, we would have corrected the asserted error only if it rose to the level of fundamental error. *See Rogers v. State*, 285 So. 3d 872, 887 (Fla. 2019). Moreover, given the other weighty aggravators found in this case, even if the CCP aggravator were invalid, there is no reasonable possibility that an absence of this one aggravator would have resulted in a different sentence. *See Hall v. State*, 246 So. 3d 210, 215 (Fla. 2018) (an error in finding the existence of CCP was harmless because "Hall has significant and weighty aggravation beyond the invalidated CCP aggravator.").

investigation report.  That report "shall be comprehensive and should include information such as previous mental health problems (including hospitalizations), school records, and relevant family background."  Fla. R. Crim. P. 3.710(b).

Woodbury argues that the PSI report prepared for this case was inadmissible because it lacked a comprehensive summary of his mental health history.  But the trial court had ample information about Woodbury's mental health issues at the time it evaluated the aggravating and mitigating circumstances.  At trial, Woodbury described his long history of bipolar disorder during numerous *Faretta* inquiries, and he gave the court documentation describing his treatment and medication.  And Dr. Sesta's report, which was placed into evidence for mitigation purposes, addressed Woodbury's mental health issues and included additional diagnoses.  Because the trial court had the relevant information and found the existence of mental health mitigation in the record, the absence of a *summary* of that information in the PSI report does not constitute fundamental error.

Woodbury also argues that the PSI report included an improper sentencing recommendation in favor of the death penalty.

Woodbury relies upon *Robertson v. State*, 187 So. 3d 1207 (Fla. 2016), where we held that although the governing statute provides that the Department of Corrections must include a disposition recommendation based on several factors in noncapital cases, those factors do not apply to capital sentencing matters. *Id.* at 1215. However, in *Robertson,* the recommendation for death did not render the PSI report invalid, for "the sentencing order show[ed] that while the court relied upon the PSI for information about Robertson's background, the officer's recommendation of a death sentence did not influence the judge's sentencing decision." *Id.* at 1215-16.

In this case, the sentencing order contains the trial court's findings on each aggravating and mitigating circumstance, including four weighty aggravators, and the sentencing order never mentions any "recommendation" from the Department of Corrections. Thus, as in *Robertson,* the sentencing order shows that the trial court's decision on whether to impose a life sentence or the death penalty was not influenced by any recommendation in the PSI report. *See id.; see also Barnes v. State*, 29 So. 3d 1010, 1028 (Fla. 2010) (holding that an unpreserved challenge to a PSI

report was barred, but that if preserved, there was "no basis to find that had the trial court not considered the PSI, Barnes would have received a life sentence"). Accordingly, we find that any error in this case in the inclusion of a sentencing recommendation in the PSI report does not rise to the level of fundamental error.

**6. Special Jury Instruction on Mercy**

Next, Woodbury argues that the trial court erred by rejecting his requested special jury instructions on mercy, and by reading the standard jury instruction instead. Standard Jury Instruction 7.11 (criminal), which the trial court read to the jury, informs jurors that "[r]egardless of the results of each juror's individual weighing process—even if you find that the sufficient aggravators outweigh the mitigators—the law neither compels nor requires you to determine that the defendant should be sentenced to death." *In re Standard Criminal Jury Instructions in Capital Cases*, 214 So. 3d 1236, 1263 (Fla. 2017). Woodbury proposed a special instruction derived from the federal standard instructions, which added: "You may always consider mercy in making this determination." He proposed an alternate instruction that he claimed came from "the ether," which added: "Mercy itself is sufficient to justify a sentence

other than death." He now claims that the court erred by rejecting his proposed instructions.

We affirm the trial court's ruling because the instruction that was read to the jury adequately informed the jurors of the applicable legal standard. *See Coday v. State*, 946 So. 2d 988, 994 (Fla. 2006) ("[F]ailure to give special instructions does not constitute error where the instructions given adequately address the applicable legal standards." (quoting *Stephens v. State*, 787 So. 2d 747, 755 (Fla. 2001)). When a juror votes for a life sentence despite finding that the aggravators outweighed the mitigators and were sufficient to impose death, this decision is often referred to as a mercy vote. In fact, we have referred to the relevant provision of Standard Instruction 7.11 as the "mercy instruction." *Reynolds v. State*, 251 So. 3d 811, 816 n.5 (Fla. 2018). Thus, the court *did* read an instruction on mercy, and although Woodbury might have preferred the wording of his proposed instruction, Standard Jury Instruction 7.11 is not ambiguous when it comes to addressing the jurors' options.

### 7. **Beyond a Reasonable Doubt Standard for Sentencing Considerations**

Woodbury next argues that the trial court reversibly erred by failing to instruct the jury that it must find *beyond a reasonable doubt* that the aggravating circumstances outweighed the mitigating circumstances and were sufficient to justify the death penalty. We affirm because Woodbury did not preserve this claim for appeal and because (as Woodbury acknowledges) we have already determined that "these determinations are not subject to the beyond a reasonable doubt standard of proof." *Rogers*, 285 So. 3d at 886.

## CONCLUSION

Because Woodbury has not demonstrated any reversible error, we affirm the judgment of conviction and sentence of death.

It is so ordered.

CANADY, C.J., and POLSTON, LAWSON, MUÑIZ, and COURIEL, JJ., concur.
LABARGA, J., concurs in result with an opinion.
GROSSHANS, J., did not participate.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LABARGA, J., concurring in result.

While I agree that Woodbury is not entitled to relief, I write to emphasize the importance of ensuring that a defendant—especially one who is facing the death penalty—is competent to conduct the basic tasks necessary to represent one's self at trial. Here, where the defendant had a significant mental health history, a competency evaluation would have been in order.

An Appeal from the Circuit Court in and for Okeechobee County, Sherwood Bauer, Judge – Case No. 472018CF000164CFAXMX

Carey Haughwout, Public Defender, Mara C. Herbert and Paul Edward Petillo, Assistant Public Defenders, Fifteenth Judicial Circuit, West Palm Beach, Florida,

for Appellant

Ashley Moody, Attorney General, Tallahassee, Florida, and Rhonda Giger, Assistant Attorney General, West Palm Beach, Florida,

for Appellee